447 So.2d 148 (1983)
ALABAMA POWER COMPANY, a Corporation
v.
Barbara A. ROBINSON, who sues as Administratrix of the Estate of Thomas Gene Robinson, deceased.
82-741.
Supreme Court of Alabama.
December 22, 1983.
As Modified on Denial of Rehearing February 24, 1984.
*149 Harold A. Bowron, Jr. of Balch, Bingham, Baker, Ward, Smith, Bowman & Thagard, Birmingham, and William O. Walton, Jr., Lafayette, for appellant.
John W. Johnson, Jr., Lanett, and R.C. Wallace, Jr., Lafayette, for appellee.
MADDOX, Justice.
A number of issues are raised by appellant, but the dispositive issue is whether the trial court erred to reversal in permitting the appellee's expert witness to offer opinion evidence, over objection,[1] regarding facts neither observed by him nor hypothesized by the use of hypothetical questions. We reverse and remand for a new trial.
This is the second appeal of this case, see Alabama Power Co. v. Robinson, 404 So.2d 22 (Ala.1981), and involves a wrongful death action commenced by appellee Barbara A. Robinson, as administratrix of the estate of Thomas Gene Robinson.
On April 10, 1975, Mr. Robinson was killed when a citizen's band radio (CB) antenna he was assisting in lowering contacted one or more electric wires of appellant, Alabama Power Company. The accident occurred at the home of Robert and Cora Smith. Robert Smith was also killed in the accident. At the time the accident occurred, Mr. Robinson had been assisting Mr. Smith in taking down the CB antenna, which had been attached to the south side of the Smith home, so that it could be repaired. The antenna and the pole to *150 which it was attached were more than 36 feet in height.
The facts indicate that Smith and Robinson discussed taking the antenna down and the consequent danger if the antenna struck appellant's power lines running along Smith Street parallel to the Smith house. The primary line of this series of lines carried 7,200 volts. There were other less powerfully charged lines close to the house. Running from a transformer attached at the set pole to the Smith residence was a three-wire service drop of wrapped, but uninsulated, wire. These lines were 120/240 volt lines. From the record, it does not appear that either Smith or Robinson was aware that the service drop lines were uninsulated.
At trial, appellee sought to establish that some part of the antenna which Robinson was helping lower contacted the uninsulated service drop lines, resulting in a shock which caused the men to stumble and drop the antenna onto the more highly charged power line. The appellant, on the other hand, attempted to show that the antenna struck the 7,200-volt power line first because the two men were careless in failing to detach a supporting guy wire; appellant says that because the guy wire was not detached, it prevented the antenna from being lowered in such a manner as to avoid touching the power lines on Smith Street, and that the guy wire pulled the antenna back so that it fell into the more highly charged power line.
At the trial, appellee's expert witness, Andrew Payne, was allowed by the trial court to testify, over objections and a motion to exclude, that the antenna "apparently" contacted appellant's service drop lines. This testimony by appellee's expert witness, along with the objections, appears in the record as follows:
"Q. If you eliminated the unnecessary conductor and had the construction as been [sic] identified on this plaintiff's exhibit 163, how would that have affected this accident here today?
"A. It would have also missed that one. To make my answer complete though, I do think I should add to that, the fact that we are talking about the contact with the primary, with the 7200 volt to ground wire. But, apparently there was also contact with the 120/240 volt service drop. [Emphasis added.]
"HAROLD BOWRONYour Honor, I object to that, there's been no testimony, no evidence of that, that's pure speculation and conjecture, it's nothing but guess, speculation and conjecture, and it invades the province of the jury. There's been no evidence of that and no testimony of that.
"COURTWell, it's an inference that can be drawn I believe, and he can, for the purpose of giving his answer he can assume that there might have been a contact with a 110 or 120/140 [sic] volt service line. That's an inference that can be drawn from the evidence.
"HAROLD BOWRONAnd just so my objection is complete, I move to exclude his answer in that regard, and I object to it on ground that it invades the province of the jury. There's been no evidence, no testimony of that, no one has testified to that; as a matter of fact, the evidence and testimony has been to the contrary, that the pole involved was started in a direction to the right toward the corner of River Road and Smith Street.
"JAMES CALDWELLAnd we object to the attorney testifying.
"HAROLD BOWRONWell, there's been no evidence and no testimony to that effect, it is pure speculation and conjecture on his part, and it is a voluntary statement on his part, he said, `of course I must add,' and that he volunteered that, there's been no evidence, no testimony of that; the evidence is to the contrary and I move to exclude it.
"COURTMotion denied.
"HAROLD BOWRONMay I have a continuing objection, your Honor?
"COURTYou may.
"A. The witness said
"Q. Mr. Noles?
"A. Mr. Noles said that when he looked up, he noticed that both of the men had *151 had hold of the antenna before the antenna touched the 7200 volt wire, that they were in trouble, that they had begun to slouch. That indicated to me that that was the contact with the 120 volt wire, that's what I would have expected to happen if they had come in contact with a 120 volt wire. And, the 120 volt wire of course, many people have been killed by a contact with a 120 volt wire, but also a great many more people have been stunned or shocked and either revive themselves or were revived by others. So, being shocked with a 120 volt conductor is one thing, but touching a 7200 volt wire is something entirely different.
"* * *
"Q. Do you have any opinion if the guy wires played any part in this accident or not?
"A. They did, yes sir.
"Q. And in what respect is that, please sir?
"HAROLD BOWRONYour Honor, I assume I have a continuing objection on each of the grounds stated previously. I object to the form of the question, and it is calling for a narrative statement. It is nothing but speculation and conjecture on his part, not premised on any facts or evidence or testimony in the record.
"COURTBased upon the evidence you heard in this trial.
"A. Yes, it is, everything I said is based upon what I heard in the trial, yes sir.
"Q. Okay, go ahead.
"A. Mr. Noles, the first witness described the men as slouching and also that he had unfastened the guy wire on the west side of the house. And, we know the service drop wires were weatherproof, which didn't provide any insulation to start with, and then there were gaps in that where the bare conductors below the weatherproofing were exposed."
Payne's opinion as to the antenna or some part of the antenna coming in contact with the service drop wire prior to coming in contact with the 7,200-volt power line was based on the previous testimony of Roger Noles, who had assisted in lowering the antenna. Noles, who at the time of the accident was kneeling on the roof of the Smith residence unfastening a guy wire which had been attached to the house, testified to the following sequence of events:
"Q. What did you see or hear?
"A. Well, I stayed on my knees and held the pole as long as I could hold it without falling off the house. And, when I was getting up and started to turn around, I heard a loud noise, and I turned around and looked, and I saw fire coming up the guy wires and saw them falling.
"Q. And then, what if anything happened to the antenna?
"A. The antenna fell back into the power lines on the side of the road.
"Q. Did you see the men fall before the antenna fell into the guy wires?
"A. Yes, sir.
"COURTBefore the antenna fell into the guy wires?
"Q. Excuse me, into the primary lines on the side of the street?
"A. Yes, sir.
"Q. Did you see the fire before it went into that area?
"A. Yes, sir.
"Q. Did you hear the noise before it went into that area?
"A. Yes, sir."
He further testified as to the location of the antenna when he saw the fire:
"Q. Did you observe the antenna immediately after you saw the fire, I mean heard the noise you referred to?
"A. Yes, sir.
"Q. How far was it from the house at the time you saw it, please sir? The eave of the house?
"A. Guessing, I would say ten or twelve feet, the top of the antenna.
"Q. Had the bottom of the antenna been moved at that time or not?
"A. No, sir.
The testimony of Delmar Smith, a witness called by the appellant, who as a passenger *152 in a passing car observed the tragic episode, testified as follows:
"Q. Tell us what you saw on that occasion at that time?
"A. Well, at that point, I was looking to my right, and these two guys was holding this CB antenna, it was leaning back like this, and it just come on back and hit the top main wire, and those two men had just stumbled forward on the ground. And, there was one guy still on top of the house. Just squatted down looking at them. I don't think he's here."
He further testified:
"Q. What was the weather like, do you recall?
"A. It had been raining. The ground was wet.
"Q. When you saw the pole, as you described it, hit the top fire as you described it, did anything happen?
"A. Just a big ball of fire, and when that big ball of fire come, those two guys, it just threw them apart like that.
"Q. Prior to the time the big ball of fire occurred, were the men standing or were they falling?
"A. No, sir, it just knocked them on the ground after it hit that line.
"Q. Before it hit the line, what were the men doing?
"A. Both of them had a hold of that CB antenna and it was leaning back this-a-way, from the house, back this way toward the power line, and then it just come on over, and when it come over, it hit that top line and then there was that big ball of fire and it knocked them two guys down. One over here and one back over here."
We include Smith's testimony to show its consistency with that of the witness Noles, upon which the expert's opinion was based. According to Smith, the men did not fall before the antenna hit the wire on Smith Street and the big ball of fire appeared, but fell after contact with the 7,200-volt more highly charged electrical line.
Appellee admits that there was no testimony that the antenna or any part of the antenna hit the service drop lines, but nonetheless argues that it was a proper inference. In brief, appellee makes the following assertion:
"Although no witness can testify that a specific guy wire, or the antenna, contacted the 3 wire service drop, Plaintiff submits that a reasonable inference can be drawn from this testimony that contact was made with the 3 wire service drop before 7,200 volt contact. If so, a jury issue is made as to such service drop contact." (Emphasis added.)
Appellant contends that it was reversible error to allow appellee's expert witness, over appellant's objections and motion to exclude, to testify to this conclusion because it was not based on any facts elicited at the trial, but on conjecture. We agree.
An expert witness may give his opinion based on his own knowledge of the facts, stating those facts and then his opinion, or he may give an opinion based upon a hypothetical question as to facts already in evidence or evidence to be subsequently admitted. Yates v. Christian Benevolent Funeral Homes, 356 So.2d 135, 139 (Ala. 1978); C. Gamble, McElroy's Alabama Evidence, § 130.01 (3d ed. 1977). Where personal observation is lacking, however, an expert witness cannot be permitted to give his expert opinion until facts upon which his opinion is to be based have been properly hypothesized before him. See Mitchell Square Bale Ginning Co. v. Grant, 143 Ala. 194, 197, 38 So. 855 (1904); Greer Bros., Inc. v. Walker, 416 So.2d 1045, 1048 (Ala.Civ.App.1982); see also 2 Wigmore on Evidence § 676 (Chadbourn rev. 1979).
The legal reasoning buttressing the necessity of hypothetical questions is explained in the following propositions:
"... 1. Testimony in the shape of inferences or conclusions always rests on certain premises of fact. That which has been called observation, serving as the basis of belief in matters directly cognizable by the sensesas, the facts of an affray, a conversation, a trespass, and *153 the likeis here replaced by what may be called a consideration of the premise. If the witness has not considered or had in mind these premises, his inference or opinion is good for nothing. 2. These premises, a consideration of which is essential to the formation of the conclusion or opinion, must somehow be supplied to the jury by testimony. The same witness may supply both premises or conclusion; or one witness may supply the premises and another the conclusion. The two are not necessarily connected. 3. If the latter method is chosen, and a witness is put forward to testify to the conclusion, the premises considered by him must be expressly stated, as the basis of his conclusion; otherwise, since his conclusion rests for its validity upon a consideration of the premises, if those premises are not made to accompany the conclusion, the tribunal might be accepting a conclusion for which the witness had considered premises found by the tribunal not to be true. 4. Hence, the premises must be stated hypothetically in connection with the conclusion; then, by other testimony, the material for determining the truth of the assumed premises may be furnished to the tribunal.
"The key to the situation, in short, is that there may be two distinct subjects of testimonypremises, and inferences or conclusions; that the latter involves necessarily a consideration of the former; and that the tribunal must be furnished with the means of rejecting the latter if upon consultation they determine to reject the former, i.e., of distinguishing conclusions properly founded from conclusions improperly founded." (Footnotes omitted.)
2 Wigmore on Evidence, supra, § 672 at 933-934.
We have opined that "[e]xperts may be permitted to state facts known to them because of their expert knowledge but should not be allowed to substitute opinion for fact, although they can express an opinion on established or assumed facts." R.L. Reid, Inc. v. Plant, 350 So.2d 1022, 1025 (Ala.1977). The fact that hypothetical questioning was not utilized by appellee's counsel when questioning appellee's expert witness was not the only flaw in this evidence, however. In the instant case, the facts were in dispute as to whether the antenna hit the 7,200-volt wire before the men fell. Roger Noles testified that his attention was first attracted to the plight of Smith and Robinson by a loud noise, which other testimony indicated was consistent with the metal antenna hitting the more highly charged wire. The only testimony suggesting that the antenna contacted the service drop wires came from witness Payne, who based his conclusion on the testimony of Roger Noles. Yet, Payne incorrectly recalled Noles's testimony by stating that the two men "began to slouch", when in actuality, Noles testified that he "saw fire coming up the guy wires and saw them falling."
The appellee contends that prior contact with the service drop lines is a reasonable inference which can be drawn from the facts shown by the evidence in this case. See Morrisette v. Commercial Credit Corp., 345 So.2d 298, 300 (Ala.Civ. App.1977). We disagree, however. Appellant's expert witness concluded that the slouching of Smith and Robinson indicated that the antenna or some part of the antenna made contact with the service drop wires prior to touching the 7,200-volt wire, despite the absence of any direct evidence supporting this scenario. Yet, an equally plausible explanation suggested by other testimony at the trial is that the antenna was difficult to handle and became unwieldy, the men lost their footing on the damp ground and accidentally dropped the antenna onto the 7,200-volt wire. Consequently, we are of the opinion that the trial court erred by permitting appellee's expert witness to testify that the antenna "apparently" struck the drop service lines. This conclusion was not a reasonable inference deduced from a premise of fact; rather it was a conclusion based on speculation and conjecture. Indeed, as a theory of causation, a conjecture is simply an explanation *154 consistent with known facts or conditions, but not deducible from them as a reasonable inference. See, e.g., Griffin Lumber Co. v. Harper, 247 Ala. 616, 25 So.2d 505 (1946).
We find it unnecessary to discuss the other issues raised by appellant; therefore, the judgment is reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.

ON APPLICATION FOR REHEARING
MADDOX, Justice.
OPINION MODIFIED; APPLICATION FOR REHEARING OVERRULED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.
NOTES
[1] The actual objection was that the expert's opinion was "not predicated on sufficient facts" and that "no proper predicate has been laid for an expression of an opinion by this witness."