The plaintiffs, James Edward Townsend, Jr., Jimmy Davenport, and Roy Price Heald, appeal from a summary judgment for the defendants, General Motors Corporation ("GM"), Pak-Mor Manufacturing Company, Inc. ("Pak-Mor"), Joe Money Machinery Company, Inc. ("Joe Money"), David J. Nolen, Jan Veal Kilgore, Eddie L. Taylor, Eugene L. Harrell, Mack Smith, and Eugene T. Greeson, in this action to recover damages for personal injuries arising out of a single-vehicle accident. We affirm.
The plaintiffs, garbage collectors employed by the City of Gadsden, were injured when the air brakes on a garbage truck on which they were riding failed while the truck was traveling down a hill, causing the truck to crash. Davenport was driving the truck at the time of the accident, and Townsend and Heald were riding on small platforms attached to the rear of the truck. The force of the collision caused Heald to be thrown into the hopper of the garbage compaction unit; Townsend was thrown from the truck and suffered a severe spinal cord injury.
The plaintiffs sued GM, Pak-Mor, and Joe Money under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), alleging that the accident was caused by a defect in the design of the brakes by GM; that their injuries had been enhanced as a result of a defect in the design of the garbage compaction unit by Pak-Mor; and that Joe Money, as a distributor or retailer, was liable for selling a defectively designed garbage truck to the City of Gadsden. The plaintiffs based their claims against the individual defendants on allegations that each of the individual defendants was a co-employee *Page 415 
who had "willfully" injured them, within the meaning of Ala. Code 1975, § 25-5-11(b) and (c)(1) (part of the Alabama Workers' Compensation Act). After extensive discovery and a hearing on the merits, the trial court entered a summary judgment for all defendants, based "on all the grounds submitted in [the defendants'] motions."
Our standard of review in this case is well settled. The summary judgment was proper if there was no genuine issue of material fact and the defendants were entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. The burden was on the defendants to make a prima facie showing that no genuine issue of material fact existed and that they were entitled to a judgment as a matter of law. If that showing was made, then the burden shifted to the plaintiffs to present evidence creating a genuine issue of material fact, so as to avoid the entry of a summary judgment against them. In determining whether there was a genuine issue of material fact, we must view the evidence in a light most favorable to the plaintiffs and must resolve all reasonable doubts against the defendants. Because this case was not pending on June 11, 1987, we must apply the "substantial evidence" rule. Ala. Code 1975, § 12-21-12. Mixonv. Houston County, 598 So.2d 1317 (Ala. 1992).
 I. GM
It is undisputed that the cab and chassis of the garbage truck were designed and assembled by GM. It is also undisputed that the air brakes on the truck failed and that the plaintiffs were injured as a result of that failure. However, the precise issue on appeal is whether, as the plaintiffs contend, there is sufficient evidence in the record to rebut GM's prima facie showing of nonliability, so as to require submission of the plaintiffs' claims against GM to a jury. The plaintiffs argue that they presented sufficient expert testimony to show that the brakes were defectively designed. Specifically, they maintain that this testimony established that GM should have designed an emergency braking system for, and installed that system on, the front wheels of the truck, as it had done with the back wheels, and that had such a design been utilized Davenport would not have lost control of the truck and the accident would have been avoided or, at least, would have been less severe. The plaintiffs also contend that the absence of separate compressed air sources for the front-wheel brakes and the rear-wheel brakes constituted a design defect and rendered the truck unreasonably dangerous. GM contends that the plaintiffs presented absolutely no expert testimony (or any evidence for that matter) tending to show that the truck's brakes were defectively designed. After carefully reviewing the record, specifically the testimony of Fred Monick and Cecil Kinsey, we must agree with GM that there was insufficient evidence of a design defect to warrant submitting the plaintiffs' claims to a jury.
Under the AEMLD, a manufacturer has the duty to design and manufacture a product that is reasonably safe for its intended purpose and use. However, the manufacturer of a product is not an insurer against all harm that may be caused by the use of the product, and the manufacturer or designer is not obligated to produce an accident-proof or injury-proof product. Likewise, the failure of a product does not presuppose the existence of a defect. Proof of an accident and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown. See Casrell v. AltecIndustries, Inc., 335 So.2d 128 (Ala. 1976); Atkins v. AmericanMotors Corp., 335 So.2d 134 (Ala. 1976); Sears, Roebuck Co. v.Haven Hills Farm, Inc., 395 So.2d 991 (Ala. 1981); Thompson v.Lee, 439 So.2d 113 (Ala. 1983); Brooks v. ColonialChevrolet-Buick, Inc., 579 So.2d 1328 (Ala. 1991). In fact, we specifically held in Brooks, a case similar to the present case, that a complex braking system, such as the one at issue here, is "precisely the type of complex and technical commodity that [requires] expert testimony to prove an alleged defect." 579 So.2d at 1333.
The evidence, viewed in the light most favorable to the plaintiffs, suggests that the truck was equipped with a four-wheel air brake system, with one air compressor supplying air to the brakes on all four wheels. A single-chamber air brake canister was attached *Page 416 
to each of the front wheels and a dual-chamber air brake canister was attached to each of the rear wheels. When the brake pedal was pressed, a push rod attached to each of the chambers would force the brake shoe to contact the brake drum on the wheel and thereby to reduce the speed of the truck. Each of the air brake canisters attached to the rear brakes also contained an emergency chamber that would respond in the event of a dangerous loss of air pressure. If there was a loss of air pressure to the rear brakes, a coiled spring would release, causing the push rod to force the brake shoe to contact the brake drum on the wheel and thereby to stop the truck or to reduce its speed. There was no spring brake feature on either of the front wheels. At the time of the accident, the push rod attached to the right rear air brake canister was broken. This canister was not original equipment on the truck (i.e., it was not put on the truck by GM at the time the truck was assembled). For some reason, which no one can explain, the truck suffered a total air brake failure while going down the hill.
The plaintiffs' primary argument is that the accident would not have occurred, or at least would have been less severe, if the truck had had three functioning spring coil emergency brakes (two on each of the front wheels and the one on the left rear wheel) instead of only one (the one on the left rear wheel). The absence of a spring brake emergency feature on the front wheels, the plaintiffs say, was a design defect actionable under the AEMLD. As noted, the plaintiffs also argue that the truck's brakes were defectively designed in that the brakes on all four wheels were supplied by a single air compressor. Of course, it was incumbent on the plaintiffs to show by expert testimony that GM's brake design was defective (i.e., that GM should have foreseen that one of the rear wheel air brake push rods could become disabled and that, if that happened, a loaded garbage truck going down a hill would not be able to stop in the event of a total air brake failure with only the assistance of a single spring coil emergency brake). However, the plaintiffs totally failed to meet their burden in this respect.
Fred Monick, an automotive engineer and one of the two witnesses relied on in the plaintiffs' briefs as having provided expert testimony with respect to the alleged defectiveness of the brake's design, testified in pertinent part as follows:
 "Q. What opinions did you give to [the plaintiffs' attorney] at that time?
 "A. Well, at that time I told him, number one, that the design of the [brake] system . . . was reasonable. . . .
"Q. And reasonably safe?
"A. Yeah.
"Q. Do you still hold that opinion today?
"A. Yeah.
". . . .
 "Q. Is it your opinion in this case that there is nothing defective or unreasonably dangerous about the design of the brake system for the truck involved in this case?
"A. That's true.
". . . .
"Q. And you are not critical of this design?
"A. No.
". . . .
 "Q. You don't have any criticism of this truck because it does not have dual rear axles?
"A. Absolutely not.
 "Q. You don't have any criticism of this vehicle because it doesn't have spring brakes on the front air canisters?
"A. No.
 "Q. And you realize that having spring brakes on the front air canisters would cause certain problems with controllability and some other things?
 "A. Yeah, there are some questions about that. Some European vehicles do have front spring brakes, but if you do lock your front wheels, you have no more steering. You will go in a straight line, that's true.
"Q. So you are not advocating that?
"A. No.
". . . . *Page 417 
 "Q. What criticism, if any, do you have of General Motors in this case?
 "A. Well, my criticism is something failed, there was another failure besides the push rod and, it could have been something that was defective as it left General Motors' hands.
"Q. You say something failed?
"A. Yes.
"Q. But you don't know what that is?
"A. As we sit here, I don't know what it is.
 "Q. If I am understanding where you are going with this, Mr. Monick, you believe that this particular truck was unique in whatever malfunction may have happened?
 "A. It could have had something, a part, a component was unique. It wasn't a design problem.
"Q. It's not a design problem?
"A. That's right.
 "Q. Are you saying that it's a manufacturing problem?
"A. It could have been a manufacturing problem.
 "Q. Can you tell me what component would have been defectively manufactured?
"A. I can't tell you that as we sit here.
". . . .
 "Q. Just so that I'm clear, and I'm finishing right now, your opinions in this case are, number one, you have no criticism of the design of the brake system on this truck?
"A. That's correct."
Cecil Kinsey, the other witness relied on by the plaintiffs, stated:
 "Q. So you are not critical of the design of the braking system?
 "A. I'm not critical of the design of the braking system, no.
". . . .
 "Q. In this particular system, as you said, you are not critical of the way the system was designed?
 "A. No, I'm not. I think it is a good designed system.
". . . .
 "Q. . . . Based on what you have seen in this case and the conclusions that you have reached, you feel that this is a good design of a brake system, correct?
"A. Yes.
". . . .
 "Q. Do you have any criticism of General Motors in anything having to do with the design of this truck?
 "A. No, I have no criticism. I don't — as I said, the braking system is a good design. It's working on a lot of trucks. Like I said, I don't know what happened to this system, when it happened, or how it happened, or what happened other than the broken [push] rod."[1] *Page 418 
As this testimony clearly indicates, neither of these witnesses expressed any criticism whatever of GM's brake design. Although both of the witnesses were critical of the city's maintenance program and agreed that the broken push rod attached to the right rear air brake canister contributed to the accident, neither of them thought that GM's brake design was unreasonably dangerous. In fact, the sum and substance of the testimony of these two witnesses was that the truck had suffered an unexplained, total air brake failure. Based on the foregoing, because the plaintiffs did not present substantial evidence to establish a defective design under the AEMLD, we must conclude that the summary judgment was proper as to GM.
 II. Pak-Mor
It is undisputed that Pak-Mor designed and built the garbage compaction unit that was mounted on the truck involved in the accident. Townsend and Heald contend that the placement of the riding platforms on the rear of the garbage compaction unit constituted a design defect and that that defect rendered the compaction unit unreasonably dangerous.[2] Townsend and Heald advocated in the trial court the alternative placement of the riding platforms in an area behind the truck's cab. The placement of the platforms in this area, they argue, was technologically feasible and would have been safer and more practical. Conceding the feasibility of a behind-the-cab placement of the platforms, but disputing the practicality of such a design, Pak-Mor primarily contends that there is insufficient evidence that a behind-the-cab placement of the platforms would, in fact, be a safer design. After again carefully reviewing the testimony of Fred Monick and Cecil Kinsey, we must agree with Pak-Mor that the summary judgment is due to be affirmed with respect to Townsend and Heald's claims against Pak-Mor.
In General Motors Corp. v. Edwards, 482 So.2d 1176
(Ala. 1985), we held that in order to prove that a vehicle was not "crashworthy" and, therefore, that it was defective under the AEMLD, the plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the vehicle. The existence of a safer, practical, alternative design must be proved by showing that 1) the plaintiffs' injuries would have been eliminated or in some way reduced by the use of the alternative design, and that 2) taking into consideration such factors as the intended use of the vehicle, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used. 482 So.2d at 1191.
Fred Monick testified in pertinent part as follows:
 "Q. Have you ever given any opinions, either for the plaintiff or defendant, respecting the location of riding steps on a vehicle?
"A. No, I haven't.
 "Q. Is this the first case that you have been consulted on respecting the location of riding steps?
 "A. Well, I wasn't really consulted on the location. I don't offer any opinions on the location, front or rear. I'm just telling you the effect of having them on the truck.
 "Q. Do I interpret that to mean that you don't have any criticism of Pak-Mor Manufacturing for the location of these steps?
"A. No, I don't have any opinion.
 "Q. Have you been asked to render such an opinion? *Page 419 
"A. No.
 "Q. Do you intend to render one at trial respecting the location of these steps?
"A. Not any further than I have gone right now.
 "Q. Do you express the opinion today that because Mr. Heald and Mr. Townsend were riding on the rear of this truck, as opposed to having been behind the cab of the truck, that they were hurt more seriously?
 "A. No. I am just simply saying that you are more likely to be ejected when you have less entrapment — you are more likely to be ejected off the back than off the front behind the cab.
 "Q. Let's assume that they were riding in a space behind the cab of this vehicle.
"A. Uh-huh.
 "Q. Are you expressing the opinion that they would not have been hurt as seriously as they were?
 "A. No, I'm not saying — I'm not expressing an opinion one way or the other. I'm just talking about the likelihood of ejection.
 "Q. Well, are you saying that had they been located behind the cab that under the facts of this accident as you know it they would have been less likely to have been ejected?
 "A. No, I'm not even saying that. . . . I have not looked at and I haven't been asked to look at the vehicle dynamics . . . at the time that it left the road until the time it landed, okay, . . . the pitching movements, the yawing movements or the rolling movements of the vehicle. . . . I'm just saying that you're more likely to be ejected from the rear than from the area between the cab and the packer from my observations of the machine I saw today.
"Q. Is that opinion a criticism of [Pak-Mor]?
 "A. It's an opinion, simply an engineering opinion. It has nothing to do with a criticism of [Pak-Mor]. I wasn't asked to talk about — I wasn't asked to look at, I wasn't asked to talk about the location of the rider. It's just something that I've deduced. . . .
". . . .
 "Q. Have you done any research, or do you have any factual evidence respecting the statistical probability of the worker suffering serious bodily injury in a crash like this one if he was riding on the rear step as opposed to behind the cab area?
"A. No, I have not. . . .
 "Q. So you would also not render an opinion that rear riding steps caused or substantially contributed to the severe injuries suffered by plaintiffs Townsend and Heald as a result of this accident?
"A. I have no opinion.
 "Q. You can't give an opinion. You also can't give an opinion respecting the national statistics for the garbage truck industry, can you?
"A. No.
 "Q. You cannot give any opinion, nor do you have any evidence of the relative likelihood of a worker on a garbage truck suffering an injury as opposed to workers employed at other occupations?
"A. That's right.
 "Q. So likewise, even with your experience, training, and education, you cannot and will not testify that the injuries to plaintiffs Townsend and Heald in this case would probably have been less severe if they had not been ejected from the vehicle at the time of the accident?
"A. If they had not been ejected?
"Q. Yes.
 "A. I could probably render an opinion on that if I did the work, but I haven't done the work on it."
As this testimony shows, Monick expressed no opinion as to whether Pak-Mor's design was defective (i.e., as to whether the injuries suffered by Townsend and Heald would have been less severe if at the time of the accident they had been riding on platforms behind the cab).
Cecil Kinsey, at the time he testified, did not have an engineering degree (although he had taken some engineering courses). He had never worked for an automobile manufacturer or a manufacturer of garbage compaction units, and he had not been involved *Page 420 
in designing or building on-the-road vehicles, such as garbage trucks. He had no expertise in determining how a human body would be affected by the various physical forces at work in a particular automobile accident, and he had no medical background (other than having a general knowledge of basic first aid). He had taken no notes during his investigation of the accident and had compiled no data or scientific studies upon which to base an opinion. He testified as follows:
"Q. . . . Are you telling me that under the facts and circumstances of this case as you know them and that you have studied and that you have already been examined on . . . that had Mr. Townsend and Mr. Heald been on steps located behind the cab that they would not have been injured?
"A. As bad. I wouldn't say that they wouldn't be injured. Ididn't say that they wouldn't be injured. I say I don't believe they would have been injured as bad.
"Q. Assume for me, Mr. Kinsey, that in fact Mr. Davenport was able to gear this truck down enough to slow it, even though he had loss of braking efficiency, and he made it to the bottom of [the hill], but he was not able to stop completely and went into that intersection. And that [truck] had been hit broadside by [another vehicle], and I think you said under direct [examination] . . . that thank goodness they didn't get hit broadside. Isn't it a fact that Mr. Heald could have been killed had he been standing on the side of it just as easily as if he had been standing on the rear?
"A. Well, the fact that none of them got killed I couldn't say that it would have been any — that that was a safe place to be because they didn't get killed.
". . . .
"A. I'm saying that if they had been put in a position between the compactor and the cab, they probably wouldn't have been hurt as bad.
"Q. Why?
"A. Well, you take the driver, for instance, he wasn't hurt as bad as they were. He got out of the truck. He was confined to the cab, and he didn't have a safety belt or air bags or anything in there. He was holding on. And they would have had communication between the cab and the riders if they had been between the compaction unit and the cab.
"Q. Let me show you plaintiffs' exhibit 4 that's been referenced and talked about, and I believe these are some of the photographs that you looked at and used in arriving at the conclusions and opinions you have given in this case today.
"The position of the truck there shows that it is, for a lack of a better word, cantilevered and cockeyed down on its lower left front, correct?
"A. Right.
"Q. An is adjacent to what appears to be either a large tree or a large bush?
"A. Uh-huh.
"Q. Are you telling me that had Mr. Davenport and Mr. Heald been behind the cab of that truck and had held on as it became airborne and landed in the position that it landed and ended up like it did there that they would not have been hurt . . . as badly as they were in the position that they were on the rear riding steps?
"A. I would come to that conclusion. I mean, on that rear riding step, one of them got thrown into the back blade section of the bin, and the other one got thrown off and hit a rock but because they didn't have any good hand and foot positions to be holding onto, or sitting down positions.
". . . .
"A. But I'm saying if the men had been next to the cab they wouldn't have been back there flapping in the breeze.
". . . .
"Q. Well, is it your opinion that under these facts and circumstances that regardless of how fast they were going they should have hung on and stayed where they were had they been behind the cab?
"A. Well, what would keep them from jumping?
"Q. I'm asking you that. *Page 421 
"A. The fellow driving could have told them to jump, I've lost control, I've got no brakes. They could have jumped. They may have broke a leg or an arm or [gotten] skinned up or something like that, but that's like saying they [would] have been killed when they hit the bottom anyway. And then we'reassuming, and I shouldn't do that.
"Q. And your opinions about whether or not they would havebeen hurt more or less had they been riding behind the cab ispurely that, it's an assumption, isn't it?
"A. It's an assumption that they wouldn't have been hurt asbad or they would have been hurt more. . . .
". . . .
"Q. So in summary, your opinion [is] that the only two safe places to ride on any type of a compaction unit, whether it be a side loader or a rear loader, [would] be either in the cab or on steps that have been located immediately behind the cab?
"A. That's what I said, yes.
"Q. And in your opinion those are the safest places to be andhad Roy Heald and . . . Mr. Townsend been located there, theywould not have been hurt as badly as they were —
"A. That's possible.
"Q. Let me finish my question. They would not have been hurt as badly as they were because they were riding on the rear steps of this truck?
"A. They would have been in a safer position or a position that could be made safer.
"Q. Have you done any statistical studies or reviewed any national information regarding the number of incidents of injury to workers who ride on rear steps of garbage trucks?
"A. There is quite a few. I've heard the numbers kicked around, but I don't know what the numbers are. But also I have not heard of anybody being hurt on a compaction unit with the safety positions between the cab and the compaction unit.
"Q. Let me ask my question one more time. And I think we'll get through this a little quicker if you listen to the question. Have you looked at any data or have you reviewed anystatistics respecting the incident rate of injury to riders onthe rear riding steps of garbage compaction units on anationwide basis?
"A. Right offhand I would have to say no. Now, I may have heard something, I don't know. I've been in a lot of conversations as far as it goes [about] garbage collection units. But right now I would have to say no.
". . . .
"Q. And then if we take that just a step back, Mr. Kinsey, the alternative you say would be to have these people in some type of position right behind the cab?
"A. Uh-huh.
"Q. You understand, though, that even right behind the cab, not being inside and not being belted in, that they still could be ejected and seriously injured in the event of an accident?
"A. Well, the county picks up my garbage, and they have these type —
"Q. Mr. Kinsey.
"A. — sitting in between, and when they come to my house they are always riding in those. And they look pretty safe to me.
"Q. Well, sir, I appreciate that, but what I'm saying [is] inan outside position no matter where it is, behind the cab orbehind the packer body, unless you have got somebody that isactually restrained, belted in, you still have that samepossibility of having someone ejected and seriously injured inthe event of an automobile accident?
"A. Well, there is a possibility.
"Q. I think you will have to agree with me there.
"A. There is a possibility, yeah.
"Q. Well, I don't think there is any possibility about it, Mr. Kinsey. I mean, if you are in a position that is outside the cab, outside the zone that in this case General Motors designed for occupants to ride that you're going to be, number one, exposed to the weather, and, number two, you are going to . . . likely . . . be ejected unless you are *Page 422 
restrained, in the event of an automobile accident.
"A. At that speed the chances of being ejected are prettygood.
"Q. Even if you are right behind the cab?
"A. Yeah.
"Q. All right, sir.
". . . .
"Q. Mr. Kinsey, you understand that there is a — well, let me ask you this: Have you ever heard of the term 'biomechanics'?
"A. Bio, that's a mechanical, sure.
"Q. Yes, sir. And it is a discipline that is intended to study how people are actually injured and how they move in automobile accidents?
"A. Yeah.
"Q. Okay. That's a specific —
"A. I've seen that on television, the dummies.
"Q. Exactly. And manufacturers study how people actually do move and how they are injured in automobile accidents, and you are aware of that?
"A. I'm aware of that.
"Q. But you are not a biomechanic?
"A. Pardon?
"Q. You are not a biomechanic? You don't hold yourself out tohave the expertise —
"A. I don't have the equipment or the access to the equipmentor the expertise — Well, I could learn the expertise. Not all that hard to do. But if you have got the equipment, that's the main thing, and you have got the — you have got the ability to do it, that's the other.
"Q. I understand. But you don't have any medical training,for example?
"A. No. Well, I've had my Red Cross training and that sort of thing but not surgical or patching up limbs or anything like that.
"Q. I understand. Since you're not an expert in biomechanics or occupant kinematics or for that matter [in] the determination of the mechanism of injury for occupants in automobile accidents, you can't state here today that had Mr. Heald and Mr. Townsend been in a different place other than the cab, since that's sort of common sense, that they would have sustained a lesser amount of injuries?
"A. I wouldn't guarantee it, but it's reasonable to assume that. Just like if you and I were behind the cab, you may be able to hold on a lot better than I could. Your hands are younger, and mine are getting old, and the human element is different.
"Q. I totally understand that. But at the same time you also understand that you had unrestrained occupants behind a cab and a packer body that in the event of a frontal collision such as we had here that when you have got bodies moving forward, you have got heads moving forward into sheet metal and into the back of that cab, much less being ejected?
"A. They could have been holding on against it, too.
"Q. Is it your testimony that you believe that these two gentlemen could hold on and ride out that impact of a 35,000-pound vehicle traveling at 60 miles an hour?
"A. I say they had a better chance between the cab and the compactor unit than they had hanging out over the back.
"Q. Even though in this particular type thing you don't hold yourself out to actually talk about specifically what injuries would have been received or whether their injuries would have been lessened if they had been in a different position?
"A. I couldn't guarantee it, no."
(Emphasis added.) Pak-Mor challenged Kinsey's testimony on the ground that he was not qualified to testify as an expert and that his testimony concerning the safety of the proposed alternative design was based entirely on his knowledge of certain previous accidents involving garbage trucks, evidence of which was excluded by the trial court on the ground that the previous accidents were not sufficiently similar to show that the garbage compaction unit in the present case was *Page 423 
defective.[3] Pak-Mor argues on appeal that Kinsey's opinion testimony should not be considered because, Pak-Mor says, it was based entirely on speculation and conjecture and was of no obvious benefit to a lay juror. The record suggests that the trial court agreed with Pak-Mor and excluded Kinsey's testimony for purposes of ruling on the summary judgment motion.
As previously noted, the truck involved here is the kind of complex product as to which one must present expert testimony to prove an alleged defect. We fail to see how a lay juror could reasonably be expected to determine whether a garbage compaction unit with riding platforms designed behind the cab would be safer than a design with the riding platforms mounted on the rear, without the assistance of expert testimony.Brooks, supra. However, a witness must be qualified as an expert before he can give an opinion as an expert. McKelvy v.Darnell, 587 So.2d 980 (Ala. 1991). To qualify as an expert, the witness must have such knowledge, skill, experience, or training that his opinion will be considered in reason as giving the trier of fact light upon the question to be determined. See generally C. Gamble, McElroy's AlabamaEvidence, § 127.01(5)(b) (4th ed. 1991), and the cases collected therein; and see the cases collected at 9 Ala. DigestEvidence Key Nos. 535, 536 (1989). A witness's testimony cannot be based on mere speculation and conjecture. See Alabama PowerCo. v. Robinson, 447 So.2d 148, 153-54 (Ala. 1983) ("as a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference"). Furthermore, whether a particular witness will be allowed to testify as an expert is left to the sound discretion of the trial court, whose decision will not be disturbed on appeal except for an abuse of that discretion.McKelvy, supra; McElroy's, supra, at § 127.01(5)(b).
Based on our review of the record, we conclude that Kinsey was not qualified to render an expert opinion as to whether the alternative design proposed by Townsend and Heald would be any safer than the design challenged in this action. Kinsey could not testify that either Townsend or Heald would have escaped injury had he been riding on a platform located behind the cab of the truck. Moreover, although he doggedly insisted that a behind-the-cab placement of the riding platforms would be a safer design, Kinsey could only "assume" that the injuries Townsend and Heald received would have in some way been reduced by the use of that alternative design. This "assumption," when considered in light of Kinsey's overall testimony, his lack of formal training or practical experience in designing garbage trucks, or any on-the-road vehicle for that matter, and his lack of training or experience in the "biomechanics" of accidents of this kind, amounts to nothing more than speculation or conjecture on his part as to the relative safety of the alternative design. We fail to see how Kinsey's testimony, taken as a whole, could have been of any real benefit to a juror attempting to determine liability in regard to this complex product. Therefore, we must conclude that the trial court did not abuse its discretion in excluding Kinsey's testimony. Without that testimony, one of the elements necessary to prove a case under the "crashworthiness" doctrine (that the design of the compaction unit was unreasonably dangerous) was missing. Therefore, the plaintiffs did not rebut Pak-Mor's prima facie showing made in support of its summary judgment motion, and the trial court properly entered the summary judgment as to Pak-Mor.
 III. Joe Money
As previously noted, the garbage truck involved in this case had two basic components — the truck (cab and chassis) and the garbage compaction unit mounted on it. The truck was delivered by GM to Pak-Mor's plant in Virginia, where the garbage compaction unit was mounted. Joe Money, the Pak-Mor distributor that sold the garbage truck to the City of Gadsden, actually purchased *Page 424 
the truck from the Pierson Chevrolet dealership in Gadsden; however, an employee of Joe Money picked the truck up at Pak-Mor's plant and delivered it first to Joe Money's plant for a brief inspection of the truck and for servicing of the compaction unit. The inspection of the truck included only a check to determine whether sufficient oil had been put in the engine and water in the radiator, and whether certain parts had been properly lubricated. After this inspection and servicing, which took approximately five hours, the truck was delivered to the City of Gadsden. The undisputed evidence shows that Joe Money did not participate in any way in designing or manufacturing the garbage truck. Clyde Money, an employee of Joe Money, testified as follows:
 "Q. Have you ever had any meetings with Pak-Mor, a representative discussing design changes, where rear-riding steps, side riding steps, were being discussed?
"A. No.
 "Q. Have you ever been to equipment shows where Pak-Mor, Heil Company, various competitors, might be showing their equipment, and it would be a national thing, people throughout this country would be coming to?
"A. I've never been to a packer national show.
". . . .
 "Q. Mr. Money, has Joe Money Machinery ever made any recommendations to Pak-Mor about design changes, or something that y'all wanted done differently on garbage bodies?
"A. No.
 "Q. Does Joe Money Machinery have any design engineers among the some 80-82 employees you've told me about?
"A. No.
". . . .
 "Q. Does Pak-Mor conduct, on a frequent or infrequent basis, a meeting of its distributors, either on a regional — let's say the distributors in the southeast would meet in Atlanta — or a national basis, where all of the distributors might attend or go to Dallas, Texas, or Washington, D.C., or someplace?
"A. No.
". . . .
 "Q. I think this will be my last question. You told me earlier, and I recall that your company had never made any recommendations as to [a] design change of the garbage body to Pak-Mor; do I recall that correctly?
"A. Not to my knowledge.
 "Q. Has Joe Money ever conducted any independent test, or evaluations, of the garbage body being produced by Pak-Mor?
 "A. No independent tests, no. Pak-Mor speaks for themselves, as far as the volume is concerned."
Under the AEMLD, a defendant alleged to be liable as a distributor of a product, such as Joe Money, may affirmatively show that it did not contribute to the alleged defective condition, had no knowledge of it, and had no opportunity superior to that of the consumer or user to inspect the product. In other words, a defendant may show that there was no causal relation in fact between its activities in handling the product and the product's alleged defective condition; provided, however, that this "lack of causal relation" defense is not available to a defendant who distributes a product under the defendant's trade name. Casrell, supra; Atkins, supra;Johnson v. Niagara Machine Tool Works, 555 So.2d 88
(Ala. 1989).
Joe Money was entitled to a judgment as a matter of law, because Townsend and Heald failed to present substantial evidence of a defect in the design of the garbage compaction unit.[4] However, the *Page 425 
judgment would have been proper even if substantial evidence of a design defect had been presented. The undisputed evidence shows that Joe Money did not participate in the design or manufacture of the garbage truck, and there is no evidence that anyone employed by Joe Money was aware of any accidents involving Pak-Mor garbage trucks that could have put Joe Money on notice that the positioning of the riding platforms on the rear of the unit was unreasonably dangerous.[5] Joe Money did not sell the truck under a Joe Money trade name, did not employ any design engineers, and had no reason to question Pak-Mor's design of its compaction unit. We held in Atkins that a distributor is not liable for a plaintiff's injuries if "he had neither knowledge of the defective condition, nor an opportunity to inspect the product which was superior to the knowledge or opportunity of the consumer." 335 So.2d at 143. The record suggests that Joe Money acted only as a "middleman" in furthering this truck's journey from its two manufacturers (GM and Pak-Mor) to the City of Gadsden. We conclude that the evidence presents no basis upon which Joe Money can be held liable under the AEMLD for the injuries suffered by Townsend and Heald. The summary judgment was, therefore, proper as to Joe Money.
 IV. Individual Co-employee Defendants
The plaintiffs alleged in their complaint that at the time of the accident David J. Nolen was the mayor of the City of Gadsden; that Jan Veal Kilgore was the city's risk manager, whose responsibilities included developing and implementing a safety program for all of the city's employees; that Eddie L. Taylor was the director of the city's Public Works Department and that his responsibilities included the overall operation of the city's garbage trucks; that Eugene L. Harrell was Taylor's assistant and the superintendent of the Preventive Maintenance Division of the city's Public Works Department; that Mack Smith was the superintendent of maintenance; and that Eugene T. Greeson was the superintendent of the city's shop where maintenance of the city's garbage trucks was actually performed. The plaintiffs further alleged that these defendants were liable under § 25-5-11(b) for "willfully" injuring them.
The evidence, again viewed in the light most favorable to the plaintiffs, indicates that, because the garbage trucks used by the City of Gadsden were subjected to heavy duty, brake problems with the trucks were common. The truck in question had had various brake problems and had needed various brake adjustments during its period of service before the accident, and it had undergone regular, routine maintenance. The truck had had one previous brake failure that resulted in an accident; however, the truck was presumably repaired after that accident in accordance with normal repair procedures. Whenever anyone complained about a problem with one of the city's garbage trucks and requested that work be done on the brakes, one or more of the mechanics in the shop working under the supervision of Eugene Greeson always complied. After repairs or adjustments had been made to the brakes of a truck, the truck was road tested before it was authorized for a return to service. Only three of the individual defendants, Harrell, Taylor, and Kilgore, had been made directly aware by Davenport before the accident that there had been any significant problems with the truck's brakes, and, because the truck was a "backup" that was not used on a daily basis, it does not appear that any of the defendants could have known for certain on the day of the accident that the plaintiffs would be riding on the truck. The accident was caused by an unexplained, sudden loss of air pressure in conjunction with a broken push rod attached to the right rear air brake *Page 426 
canister that had gone undetected for some time and that had reduced the effectiveness of the right rear brake. Detection of the broken push rod was hampered by its particular placement under the truck.
Without belaboring the point, suffice it to say that we have sifted through the evidence and conclude that none of it constitutes substantial evidence that the defendants "willfully" injured the plaintiffs, within the meaning of §25-5-11(c)(1). The plaintiffs do not argue that any of the co-employee defendants had a motive or a reason to want to intentionally injure them, and from the evidence one could not reasonably infer that reasonable people in the positions of these defendants would have known that injury or death was substantially certain to follow from the plaintiffs' use of the garbage truck on the day of the accident. See, e.g., Reed v.Brunson, 527 So.2d 102 (Ala. 1988); Williams v. Price,564 So.2d 408 (Ala. 1990). The summary judgment was proper as to the individual co-employee defendants.
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES and KENNEDY, JJ., concur.
[1] We note that two other witnesses who testified as experts, Ivin Meeks and Robert Cox, also stated that they had no criticism of GM's brake design. Meeks testified as follows:
 "Q. Do you have any opinion regarding that air canister, whether it was a good air canister or a bad air canister or anything else, the way it was designed?
"A. I would say it was fine the way it was designed.
 "Q. As far as the rest of the brake system, do you have any criticism of the brake system on this truck?
"A. No.
". . . .
 "Q. And as far as you know, is it a reasonably safe brake system?
"A. Yes, sir.
"Q. And you hold that opinion today?
"A. Yes, sir.
 "Q. As far as you know, and I'm asking this as a question, the way that the brake system, air brake system on this truck was designed and manufactured by General Motors, it was reasonably safe?
"A. Yes, sir.
 "Q. And do you believe it was that way when it left the hands of General Motors?
"A. Yes, sir.
". . . .
 "Q. So what I'm saying is you don't have any criticism of General Motors in this case?
"A. None whatsoever.
". . . .
 "Q. Am I correct that you do not have an opinion that the way that this brake system was designed that it was inadequate or insufficient to stop the truck? You don't hold that opinion, do you?
"A. No."
Cox stated:
 "Q. So am I correct that you have no criticism of this truck, this garbage truck, except for that fractured push rod?
"A. That's correct.
 "Q. In your opinion, except for that fractured push rod, this is a reasonably safe truck?
"A. I guess so."
[2] As a matter of law, Davenport, who was inside the cab of the truck when the accident occurred, has no claim against Pak-Mor for the injuries that he sustained. With respect to Davenport's claim against Pak-Mor, the summary judgment was proper.
[3] Because we agree with Pak-Mor that Kinsey was not qualified to render an expert opinion with respect to the safety of the proposed alternative design, we find it unnecessary to address the plaintiffs' contention that the trial court erred in excluding evidence of the previous accidents.
[4] As stated in note 2, Davenport, who was driving the truck at the time of the accident, has no claim against Pak-Mor. Townsend and Heald argue on appeal that Joe Money should be liable for the alleged defect in the design of the garbage compaction unit. Davenport does not argue on appeal that Joe Money should be liable for the alleged defect in the design of the truck's brakes. We note, however, that had Davenport made that argument, we would reach the same conclusion with respect to his claim against Joe Money that we reach with respect to the claims of Townsend and Heald. The summary judgment with respect to Davenport's claim against Joe Money was proper.
[5] Clyde Money testified that he was aware of two incidents in which workers had been injured on trucks equipped with Pak-Mor compaction units. In one of those incidents a worker riding on the rear of a truck suffered injuries to his leg when the truck was struck from the rear by another vehicle. In the other, a worker was injured in some way when he jumped from a truck equipped with a Pak-Mor unit. Neither of these incidents was sufficient to place Joe Money on notice that Pak-Mor compaction units might be defectively designed.