663 So.2d 961 (1995)
Carmen Ray AMMONS
v.
MASSEY-FERGUSON, INC.
No. 1940038.
Supreme Court of Alabama.
July 7, 1995.
James H. Tipler of The Tipler Law Offices, Andalusia, for appellant.
Peter V. Sintz of Sintz, Campbell, Duke & Taylor, Mobile, for appellee.
*962 PER CURIAM.
AFFIRMED. NO OPINION.
See Rule 53(a)(1) and (a)(2)(A), Ala. R.App.P.
MADDOX, ALMON, SHORES, and COOK, JJ., concur.
HOUSTON, J., concurs specially.
BUTTS, J., dissents.
HOUSTON, Justice (concurring specially).
The plaintiff appeals from a judgment based on a directed verdict for the defendant manufacturer of a tractor. The plaintiff sought damages based on the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), alleging that the tractor was defective. The tractor was owned by Covington County; the plaintiff, who was an employee of the county, was injured while operating the tractor, when he was hit either by a tree branch or by an object thrown by a mower being drawn by the tractor.
The sole issue presented on appeal is whether the trial court abused its discretion in refusing to allow Herbert Bogert to testify as an expert witness. "[W]hether a particular witness will be allowed to testify as an expert is left to the sound discretion of the trial court, whose decision will not be disturbed on appeal except for abuse of that discretion." Townsend v. General Motors Corp., 642 So.2d 411, 423 (Ala.1994).
The record reveals the following colloquy between the trial court, Bogert, and the attorneys:
"The Court: What do you know that the folks in the jury box don't know about whether or not this tractor should have been guarded?
"Witness: Well, from the point of view, from a safety manufacturer's point of view, that when a condition of hazard exists, is known to exist, and is readily remediable and that is something can be done that is relatively economical, that is relatively disruptive [sic] to the machine, and practical without redesigning equipment and all of that, then it should be done.
"Well, from the point of view that a manufacturer has, for an obligation from a safety point of view, I am not talking about the legalities here, I am not a legality person. But from the point of view of a safety man, if I was serving as a consultant to a manufacturer in that situation, one of the things that I would recommend is that they make available, and openly available, knowledge of the fact that this tractor should be equipped and we have the device available and/or preferably build it on just as they have the roll bar, that becomes a standard part of the equipment.
"I am talking about a shield that goes between the vertical post of the roll bar that will stop material flying through and hitting a person. That is not a complicated thing I have to agree.
"The Court: That's what I'm asking you, what do you know about it that they don't know? You haven't told me yet.
"Witness: Well, maybe that is one of the problems in the safety business. Most things, once people put their mind to thinking about it, become obvious. A [safety man's] job, so many times, is to point out those things that ah, yeah, I see what you mean.
"My point in this is, where I fit into the picture, is bringing up a remedy, a means and method by which this particular type of an injury could have been prevented. And would have been prevented if such a grill work in the back had been installed [on] this tractor. Now the best way to have such a thing available is through a manufacturer.
"The Court: Why is that?
"Witness: Because first of all any retro-fit type of thing normally is not as well tailored to the dimensions, the mounting capability
"The Court: You talking about a piece of expanded metal?
"Witness: Basically, yes.
"The Court: How wide does it have to be?
"Witness: In this situation it could come from the roof area above down.

*963 "The Court: From the top of the [rollover structure]?
"Witness: Yes.
"The Court: All the way down?
"Witness: Preferably all the way down. There are sometimes limitations as to how far down it could come, but it could certainly come down to as low or below the seat, which protects the main body of a person. And this particular case has a plug in for hydraulic lines, because the equipment in the back is down low, but at a level that is below where the protection is to be added.
"The Court: So how many people get hurt each year by objects thrown from a bush hog ["Bush Hog" is the trade name of a large mower generally drawn by a tractor. The term "bush hog" is often used generally for such mowers and as a verb indicating the use of such mowers.]?
"Witness: That of course is one of the questions that I cannot give an exact answer on.
"The Court: Well, if it was one person would you recommend that the entire industry put expanded metal on every machine they sell that might possibly be used for bush hogging?
"Witness: Well, first of all I know it is more than one.
"The Court: No, you don't. You don't know how many it is.
"Witness: Well, I know of two. I'm one of them. But my point is, over the years I have been in the safety business I have known of many people who have been hit by materials flying out of mowers and hitting them in the back, hitting them in the arms, back of the neck, back of the head.
"The Court: Are we talking about bush hogs or mowers?
"Witness: No, bush hog type of mowers, rotary mowers.
"The Court: You have known of a lot of drivers being hit by things?
"Witness: Yes, I have.
"The Court: How many drivers do you know of that received serious injuries as a result of that?
"Witness: I don't know of any of them that have gotten a serious enough of injury to become an issue of litigation, no. But I have known of many people who have been hit and injured, yes. But now the severity of an injury is where the issue of chance comes in. The frequency or the occurrence of the injuries is what a safety man works on.
"The Court: How many people do you know that have gotten hurt because they were bush hogging and an object, which was not thrown but was in the path of the bush hog, came through the back of the tractor and hit them? Not thrown?
"Witness: I have known several. I guess in the realm of a couple of dozen. There again, myself being one of them.
"....
"Witness: Well, when known hazards exist, corrective measures should be taken.
"The Court: Are you saying that any hazard has to be corrected regardless of how often an accident happens or regardless of what it takes to correct it?
"Witness: Well, from a safety man's point of view if accidents are occurring, the tolerance level is zero.
"The Court: So are you telling me that if a machine causes, or is involved in an accident where somebody is hurt, that that machine is unreasonably dangerous?
"Witness: I don't know how you would really in that regard define unreasonably dangerous except that when there are repeated occurrences in a repeated particular realm, that establishes a recognizable, in a recognized hazard, which incidently under OSHA, even requires that protective measures be taken whether it is specific otherwise as to how to do it or not, those recognized hazards shall be corrected.
"Well, now the principle applies on a manufacturer who putting a product on the market, which is getting involved in a category of accidents, that there need to be protective devices installed and made available to ... prevent those injuries.
"....

*964 "[Plaintiff's attorney]: Mr. Bogert, what other information do you have about the amount of danger to a person who is riding in a cab that is not shielded? Is that something that happens a lot?
"[Witness]: Yes, it does.
"....
"[Plaintiff's attorney]: What is the source of your knowledge, sir?
"[Witness]: Well, a scar on my back, my own back.
"[Plaintiff's attorney]: Scar on your back?
"[Witness]: A scar on my back, yes.
"[Plaintiff's attorney]: What do you mean, sir?
"[Witness]: Well, there was a chunk of an apple tree when I was mowing flew out and hit me in the back. It kind of told me that there is a real possibility of that. And of course in my work over the years in farm safety I have been around all kinds of groups and organizations for safety programs, having discussions with the people involved and I have talked to many people who have had stuff fly out and hit them in the back [while] operating a tractor. And others that knew of neighbors and friends that have had the same thing. So I do know firsthand with myself, as well as on the basis of talking to other people who have had similar experiences and that they know of other people. And these are all realms of my own personal knowledge. So, yes, I know it is a hazard. And naturally also in talking with other safety people confirmed likewise that this is a hazard.
"....
"The Court: ... [I]t all goes down to the way I view whether or not what something that is unreasonably dangerous has to do with what is the probability of injury and what is the cost to fix it. In other words, we could all drive ... tanks down the road and very few of us would get hurt. We couldn't afford it. There is a compromise that society makes. The jury has to make that compromise when they decide what is unreasonably dangerous.
"We decide that we are going to sacrifice some amount of safety for some amount of utility and the jury ends up making that decision based on what they believe is unreasonably dangerous and basically what I think product liability law evolves down to. I know it is much more complicated than I have just stated, but just basically that is how I see that.
"So far, the problem here is the jury has to have facts to make that decision and they don't have those facts.
"....
"The Court: What I am going to do is, at the [outset] of this I was talking about tying it up and what I meant by tying it up, as I explained earlier, was sufficient testimony that allowed the trier of facts to [find] that the tractor [was] unreasonably dangerous based on things like the number of incidents that occur, the severity of the incident. Merely the things that come out of a bush hog and hit people is not sufficient. You have to show how many people get seriously injured, how many people
"[Plaintiff's attorney]: Or got hit by a tree limb.
"The Court: We haven't seen that yet. We don't know if Mr. Ammons's injury is like one out of, you know, a year or if there are twenty thousand a year. We just don't know.
"[Plaintiff's attorney]: There are no statistics with regard to that, Your Honor.
"The Court: Your expert did not establish the degree of dangerousness without I mean every product used is dangerous to some extent. Without establishing the degree of dangerousness then you cannot ask a jury to determine whether or not it was unreasonably dangerous."
A witness must be qualified as an expert before being allowed to give an opinion as an expert. To qualify as an expert, the witness must have such knowledge, skill, experience, or training that his or her opinion will be considered in reason as giving the trier of fact light upon the question to be determined. Townsend v. General Motors Corp., supra. In addition, a witness, even one qualified as an expert, must have a factual basis for an opinion. Although any challenge to *965 the adequacy of the factual basis for an expert's opinion normally goes to the weight rather than to the admissibility of the evidence, if the facts relied on by the witness clearly are insufficient to support an opinion, then the challenge may go even to the admissibility of the opinion. Morris v. Young, 585 So.2d 1374 (Ala.1991); Alabama Power Co. v. Robinson, 447 So.2d 148 (Ala.1983); see, also, J. Colquitt, Alabama Law of Evidence, § 7.3 (1990). A witness's testimony cannot be based on mere speculation and conjuncture. Townsend v. General Motors Corp., supra.
After carefully reviewing the record, I cannot say that the trial court abused its discretion in excluding Bogert's opinion that the tractor was defective because it lacked a metal screen or a plastic shield behind the driver's seat. "Defectiveness" under the AEMLD has been defined by this Court to mean that the product does not meet the reasonable expectations of an ordinary consumer as to its safety, i.e., that the product is not reasonably safe for its intended purpose and use. Townsend v. General Motors Corp., supra; Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976). The record suggests to me that although Bogert had an academic background in agricultural education and had general experience in safety-related matters, he failed to demonstrate that he would be able to assist the jury in determining whether the Massey-Ferguson Model 290 tractor on which Ammons was injured was unreasonably dangerous. The undisputed evidence indicates that the tractor met the county's stated safety specifications. Thus, nothing in the evidence suggests that the tractor did not meet the reasonable expectations of the county. The tractor in question was a multi-purpose agricultural tractor that was designed to be used with a number of attachments (e.g., a plow, a baler, a backhoe) that could be incompatible with Bogert's proposed screen or shield. Bogert, who was not an engineer and who lacked experience in tractor design, could present no statistics (other than the fact that he and certain other unspecified individuals had been struck by objects while driving tractors with no screen or shield) or test results on which to base his opinion that the risk of harm was unreasonable without the addition of a screen or shield, or any evidence suggesting a reason why Massey-Ferguson, the manufacturer of the tractor, as opposed to the county, was in a better position to know how the tractor would ultimately be used on a daily basis and, thus, whether such a device would be practical. Furthermore, Bogert provided no explanation as to why it would be unreasonable for Massey-Ferguson to rely on the standard practice of manufacturers of tractor-drawn mowers to make available "chain guards" to deflect objects thrown by the mower's blades.
Massey-Ferguson was not an insurer against any and all harm to which Ammons was exposed while operating the tractor. Bogert seemed to place great emphasis on his belief that Ammons would not have been injured if the tractor had been equipped with a screen or a shield and on his belief that such a device would have made the tractor safer. Based on the evidence presented in this case, I think these beliefs would probably be shared by most jurors. It is well settled, however, that proof of an accident and an injury is not in itself sufficient to establish liability under the AEMLD. Townsend v. General Motors Corp., supra. Logically, then, such proof cannot form the basis for an opinion that a product is "defective" within the terms of the AEMLD. Bogert's testimony, lacking a factual foundation, was speculative at best and of no apparent help to the factfinder. The record reflects that the trial court sensed this. See Macon County Comm'n v. Sanders, 555 So.2d 1054 (Ala. 1990) (expert must possess knowledge beyond that of the average person so that his or her testimony will aid the factfinder); Ex parte Hill, 553 So.2d 1138 (Ala.1989) (expert testimony is admissible if the subject matter is beyond the normal knowledge or experience of the average person and the testimony is helpful to the factfinder in making a finding in accordance with the evidence and the applicable law).
I agree that the trial court did not abuse its discretion in excluding Bogert's opinion that the tractor was unreasonably dangerous; and, because there was no other evidence creating a fact question as to whether the *966 tractor was defective within the terms of the AEMLD, I agree that the trial court properly directed a verdict for Massey-Ferguson.