878 So.2d 267 (2003)
AKINS FUNERAL HOME, INC.
v.
Andrea Megan MILLER.
Akins Funeral Home, Inc.
v.
Teresa Miller.
1020198, 1020224.
Supreme Court of Alabama.
September 26, 2003.
*268 R. Larry Bradford and Shane T. Sears of Bradford Law Firm, P.C., Birmingham, for appellant.
Barry A. Ragsdale of Ivey & Ragsdale, Birmingham; and Garve W. Ivey, Jr., of Ivey & Ragsdale, Jasper, for appellee Andrea Megan Miller.
L. Andrew Hollis and Gregory M. Zarzaur of Hollis & Wright, P.C., Birmingham, for appellee Teresa Miller.
MADDOX, Retired Justice.
These cases, which were consolidated for trial, arise out of an automobile accident in which three young people were killed. Andrea Megan Miller and Teresa Miller, surviving relatives of one of the accident victims, sued the two funeral homes that were involved with the funeral arrangements of one of the victims, whose body was cremated rather than buried as the surviving relatives desired. The Millers settled their claims against one of the funeral homes, but the case involving Akins Funeral Home, Inc., went to trial before a jury, which returned a verdict for the Millers.
These appeals present three legal issues: (1) whether the trial court erred in allowing a witness, who was not a psychologist or psychiatrist, to testify as an expert and offer what Akins alleges were medical opinions; (2) whether the jury's award of compensatory damages in both cases was against the great weight of the evidence; and (3) whether the punitive-damages awards were excessive.
We have carefully reviewed the facts and the law relating to the issues presented, and we conclude that the trial court did not err; therefore, we affirm.

Facts and Procedural History
Nineteen-year-old Matthew Miller ("Matt") and two others were killed in an automobile accident that occurred on February 20, 2000. When he arrived at the scene of the accident, a volunteer fireman, Kenny Colburn, thought he recognized the automobile involved in the accident as belonging to his stepdaughter, Andrea Megan Miller, who was Matt's wife. He left the scene of the accident and went to the house of Teresa Miller, Matt's mother. He learned from Teresa that Megan was safe, but that Matt had left in the automobile. Colburn returned to the accident scene with Teresa Miller and Tommy Miller, Matt's brother. When they arrived, they were informed that all three occupants of the car, including Matt, had been killed.
All three bodies were transported to the Kilgore-Green Funeral Home in Jasper. The Miller family decided to use Akins *269 Funeral Home, Inc. ("Akins"), to handle Matt's funeral, and at the request of the family, Doil Akins traveled to Jasper and retrieved what had been identified as Matt's body; the body, however, was the body of Johnny Russell, who was also killed in the accident. The Russell family arranged with Kilgore-Green to cremate Russell's body, although it was in fact Matt's body that was cremated. That night, Akins embalmed the body of Johnny Russell.
On February 21, 2000, Megan, Teresa, and other members of the Miller family went to Akins Funeral Home to make the arrangements for Matt's funeral. At the funeral home they met with Raymond Vernon, the funeral director, and Teresa signed a contract. The evidence presented at trial by the plaintiffs, including the testimony of Teresa; Randy Calhoun, Matt's uncle; Tommy Miller; and Colburn, indicated that before the family left the funeral home, Teresa asked to view her son's body; Vernon told her that, until one-half of the funeral expenses were paid, she could not see the body and the body would not be delivered to the church for the funeral.[1] Evidence presented by the Millers indicated that Akins ultimately agreed to deliver the body to the church for the funeral where checks would be collected from various relatives to pay one-half of the funeral expenses.
Vernon disputed the evidence presented by the Millers regarding what took place at the funeral home. He testified that no member of the immediate family asked to view the body, that he did not deny family members the privilege of viewing the body, and that he would have delivered the body to the church for the funeral regardless of whether the funeral expenses had been paid.
The funeral was scheduled to take place the evening of February 21, 2000, at the Thorptown Holiness Church, and Vernon transported the body to the church. With approximately 400 mourners present, the casket was opened, and Teresa viewed the body for the first time. It was at that time that all present realized that a mistake had been made and that the body in the casket was not Matt's body. Vernon returned to Akins Funeral Home with the body, and telephoned Kilgore-Green Funeral Home. During that telephone conversation Vernon learned that Matt's body had been cremated that afternoon.
In support of their claims, the Millers presented testimony regarding the traumatic effect the unintentional cremation of Matt's body had upon them. Evidence was also presented to show the religious and moral objections to cremation Matt and his family shared. The Millers also presented evidence indicating that Teresa attempted suicide twice over the few weeks following Matt's cremation and Teresa testified that she believed because Matt was not buried "in a humanly state and only his ashes that he could not be resurrected in the eyes of God." Testimony was also presented indicating that Megan "has not been the same" since the cremation; that she suffers from nightmares and flashbacks; and that she struggles with how she will tell her and Matt's son that his father was cremated in violation of his beliefs and wishes.
Teresa and Megan each sued Akins, alleging negligence and wantonness, the tort of outrage, breach of contract, trespass, *270 and abuse of a corpse.[2] As pointed out above, Teresa's case and Megan's case were consolidated, and at the conclusion of the trial, Megan's case was submitted to the jury on the counts alleging negligence, wantonness, and the tort of outrage. Teresa's case was submitted to the jury on the counts alleging breach of contract, negligence and wantonness, and the tort of outrage. The jury returned a verdict against Akins and in favor of both plaintiffs. The jury assessed compensatory damages at $450,000 and punitive damages at $150,000, for a total of $600,000 in Megan's case; in Teresa's case, the jury assessed compensatory damages of $200,000 and punitive damages of $150,000, for a total of $350,000.
In each case, Akins filed a motion for a new trial and a motion to remit the punitive damages; those motions were denied.

Standards of Review
Because each issue that is before us has a different standard of review, we will state the standard of review that applies to each issue.
In reviewing a ruling on the admissibility of expert testimony, this Court must determine whether the trial court exceeded its discretion in allowing the expert testimony. In Tidwell v. Upjohn Co., 626 So.2d 1297, 1300 (Ala.1993), this Court stated: "[A] ruling on the admissibility of expert testimony is largely within the discretion of the trial court and will not be overturned unless there has been an abuse of discretion." In Bagley v. Mazda Motor Corp., 864 So.2d 301, 304 (2003), this Court quoted Ammons v. Massey-Ferguson, Inc., 663 So.2d 961, 962 (Ala.1995), quoting in turn Townsend v. General Motors Corp., 642 So.2d 411, 423 (Ala.1994), and restated the principle as follows: "`"[W]hether a particular witness will be allowed to testify as an expert is left to the sound discretion of the trial court, whose decision will not be disturbed on appeal except for abuse of discretion."'"
The second issue presented here is whether the compensatory-damages awards were excessive. This Court has stated the following in determining whether a compensatory-damages award for mental anguish is excessive:
"`This Court has long held that "[t]here is no fixed standard for ascertainment of compensatory damages recoverable ... for physical pain and mental suffering" and that "the amount of such [an] award is left to the sound discretion of the jury, subject only to correction by the court for clear abuse and passionate exercise of that discretion." This Court has consistently held that a trial court cannot interfere with a jury verdict merely because it believes the jury gave too little or too much.' "Daniels [v. East Alabama Paving, Inc.], 740 So.2d [1033,] 1044 [(Ala.1999)] (citations omitted [in Daniels])."
National Ins. Ass'n v. Sockwell, 829 So.2d 111, 135 (Ala.2002).
When reviewing whether a punitive-damages award is excessive, the third issue presented in this case, this Court conducts a de novo review. In Orkin Exterminating Co. v. Jeter, 832 So.2d 25, 39 (Ala.2001), this Court stated:
"Recently, in Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the United States Supreme Court addressed the question whether an appellate court should review a trial court's punitive-damages award by applying an abuse-of-discretion standard *271 or by applying a de novo standard. Reasoning that the guideposts established in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (`BMW'), `will acquire more meaningful content through case-by-case application at the appellate level,' the Supreme Court held that `courts of appeals should apply a de novo standard of review when passing on [trial] courts' determinations of the constitutionality of punitive damages awards.' Cooper Industries, 532 U.S. at 436, 121 S.Ct. at 1685-86. In Acceptance Insurance Co. v. Brown, 832 So.2d 1 (Ala.2001), we recently embraced that standard, holding that our review of a trial court's punitive-damages award is de novo.

"In reviewing a punitive-damages award for excessiveness, this Court considers the `guideposts' established in BMW and the factors set out in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). See Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 978 (Ala.1998)."

Discussion

I.
Considering the above-stated standard of review relating to a ruling on the admissibility of expert testimony, we now address whether the trial court erred in permitting Judy Davidson, Ph.D., who was not a physician, psychiatrist, or psychologist, to testify as an expert witness. Davidson was called as a witness by the Teresa Miller. Akins argues that part of her testimony was a "medical diagnosis" and that her testimony should not have been allowed because, Akins argues, "only a physician or an individual authorized by statute may formulate a medical diagnosis and state the cause of the injury." (Akins's brief, p. 15.)
Davidson testified that she was a freelance consultant and that she had "a doctorate in health education, [a] masters in health education, [and an] undergraduate bachelors degree in sociology." She stated that she has done "course work in marriage and family counseling and social work, a post-doctorate [sic]," and that she was "a certified death educator, board-certified trauma specialist." She stated that in 1993 she started her freelance consulting work and that she trains "school and community agencies in crisis management, grief and trauma in 33 states." She also testified that she counsels individuals and families in the evenings and on weekends. She stated that she primarily served "families who have experienced murders, suicide, sudden deaths; meaning heart attacks, strokes or natural causes, accidental deaths, and then deaths related to natural disasters like hurricanes tornadoes ... [or] fires." Davidson also testified that she was a member of the Association of Death Educators and Counselors and the Academy of Traumatic Stress Specialists.
During direct examination, she was asked what her clinical findings were regarding Teresa Miller; she replied that Teresa Miller was suffering from severe post-traumatic stress disorder. Akins objected, stating that Davidson was not qualified "to make that diagnosis. She's not a psychologist or psychiatrist. It's a medical diagnosis." On voir dire examination, Akins elicited Davidson's testimony that she was not a psychiatrist, a psychologist, or a licensed counselor. During the voir dire examination of her qualifications and fitness to testify, Davidson stated that for her assessment of Teresa Miller she had relied on the Diagnostic and Statistical Manual of Mental Disorders. She stated that she had "a degree in school and community health which does include death *272 and dying, does include stress-related illnesses and emotional health." She stated that her doctorate degree repeats "that same kind of thing," and that the subject of her doctorate dissertation was "adjustment to bereavement." She further stated that she was a "death educator" and a "board-certified trauma specialist." She testified that since 1982, she had trained thousands of people and debriefed hundreds of people who had experienced traumatic events. She testified that she had written a book on death and dying and had published numerous articles in magazines and journals relating to grief and loss.
At the conclusion of the voir dire examination of Davidson, Teresa Miller's attorney asked Davidson if Teresa was suffering from post-traumatic stress disorder, which again elicited an objection from Akins. At that time, the trial judge stated, "I believe she is qualified to testify to that. I'm going to allow it. You can ask her about it on cross-examination, of course."
Davidson then detailed four categories of post-traumatic stress disorder and detailed the various symptoms that Teresa Miller showed that put her into each of the four categories.
In its brief to this Court, Akins states:
"Dr. Davidson concedes that she was diagnosing the plaintiff with post-traumatic stress disorder. After [Akins's] attorney objected to Dr. Davidson's testimony, Dr. Davidson was asked about her clinical findings.
"`Q. Is that a medical diagnosis?
"`A. It's a diagnosis based on these criteria, and I simply followed the guidelines.'
"....
"However, Dr. Davidson is not a psychiatrist or psychologist. She is not even a licensed counselor. Dr. Davidson does not possess statutory authority to diagnose patients. She concedes that she did not attempt to treat Teresa Miller. She did not provide any counseling to Teresa Miller."
(Akins's brief, pp. 25-26.) Akins also states:
"Alabama case-law appears well settled that only a physician or an individual authorized by statute may formulate a medical diagnosis and state the cause of the injury. Alabama courts have specifically limited expert medical testimony to individuals that have the appropriate medical training for the specific injuries sustained by the plaintiff."
(Akins's brief, p. 15.) Akins cites Nelson v. Elba General Hosp. & Nursing Home, Inc., 828 So.2d 301 (Ala.Civ.App.2000), rev'd on other grounds, 828 So.2d 308 (Ala.2001); Phillips v. Alamed Co., 588 So.2d 463 (Ala.1991); Kriewitz v. Savoy Heating & Air Conditioning Co., 396 So.2d 49 (Ala.1981); Tidwell v. Upjohn Co., supra; § 34-26-42, Ala.Code 1975; and § 15-23-46, Ala.Code 1975, to support its argument that Davidson was not qualified to testify.
The Millers argue (1) that the trial court has broad discretion regarding the admissibility of expert testimony and that the trial court did not exceed its discretion in allowing Davidson's testimony; (2) that Davidson was fully qualified to testify as an expert in this case; and (3) that the nature of Davidson's testimony did not require that she be a medical doctor.
The general rule in Alabama regarding the testimony of expert witnesses is Rule 702, Ala. R. Evd. Rule 702 states:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may *273 testify thereto in the form of an opinion or otherwise."
See also § 12-21-160, Ala.Code 1975. In Knapp v. Wilkins, 786 So.2d 457, 461 (Ala.2000), this Court stated:
"`The question whether a witness is qualified to testify as an expert on a particular subject is largely within the discretion of the trial court, and that court's judgment on that question will not be disturbed absent an abuse of discretion.' Brown v. Lawrence, 632 So.2d 462, 464 (Ala.1994). See also Husby v. South Alabama Nursing Home, Inc., 712 So.2d 750, 753 (Ala.1998). However,
"`"[t]he criterion for admission of expert testimony is that the witness, by study, practice, experience or observation as to the particular subject, should have acquired a knowledge beyond that of ordinary witnesses."
"`"... To qualify as an expert a witness does not have to be shown to be infallible or possessing the highest degree of skill."
"`It is also declared that "the nature of a wound or injury, its probable cause and effect, may be shown by expert medical witnesses or witnesses shown to be familiar with such questions...."'
"Kitchens v. State, 31 Ala.App. 239, 241, 14 So.2d 739, 741 (1943) (citation omitted) (emphasis added)."
In Phillips v. Alamed Co., 588 So.2d 463 (Ala.1991), this Court stated:
"Phillips also argues that the court erred by sustaining Alamed's objection to testimony by Anne Bailey-Allen, a registered nurse, on the issue of proximate cause. The trial court held that testimony on the issue of proximate cause could be provided only by a physician. As a general rule, decisions as to a witness's competency to testify as an expert on a particular subject are within the discretion of the trial court. Ward v. Dale County Farmers Co- op., 472 So.2d 978 (Ala.1985). Those decisions will not be reversed by this Court absent an abuse of discretion. Bell v. Hart, 516 So.2d 562 (Ala.1987); Byars v. Mixon, 292 Ala. 661, 299 So.2d 262 (1974).
"The question of whether Alamed's failure to report Ms. Phillips's complaint of shortness of breath to her physician proximately caused her death is clearly a question involving complex medical issues. Therefore, we cannot say that the trial judge abused his discretion by requiring the testimony of a physician and, implicitly, holding that a registered nurse was not competent to testify as an expert on the issue of proximate cause. Bell, supra; Byars, supra.

"Finally, Phillips contends that the trial court's ruling was error because, he contends, this Court has previously approved of testimony by nonphysician witnesses regarding causes of death. He directs this Court's attention to our opinions in Police & Firemen's Ins. Ass'n v. Mullins, 260 Ala. 173, 69 So.2d 261 (1953); Hicks v. State, 247 Ala. 439, 25 So.2d 139 (1946); and Blakeney v. Alabama Power Co., 222 Ala. 394, 133 So. 16 (1931), as support for his argument.
"In response, Alamed points out that the medical cause of Ms. Phillips's death, i.e., a pulmonary embolus, was never in dispute. Therefore, it argues, the cases relied on by Phillips are not relevant to the issue of whether the trial judge abused his discretion by holding that Ms. Bailey-Allen was not competent to testify regarding proximate cause. We agree. Phillips's argument fails to recognize the important distinction between the question of what ailment or organic *274 failure caused Ms. Phillips's death and the question of whether Alamed's alleged negligence was the proximate cause of her death."
588 So.2d at 465. In Kriewitz v. Savoy Heating & Air Conditioning Co., supra, this Court stated:
"[T]he appellants contend that the trial court erred in refusing to allow two clinical psychologists to testify as to the cause of the appellants' condition. The psychologists were allowed to testify that the appellants had suffered brain damage and, in fact, one of the psychologists was permitted to state that Mr. Kriewitz had `organic brain syndrome.'
"What the psychologists were not allowed to express an opinion on was the medical causation of that condition. This is in line with Code 1975, § 34-26-1, which states:
"`a) A person practices as a "psychologist" within the meaning of this chapter when he holds himself out to be a psychologist and/or renders to individuals or to the public for remuneration any service involving the application of recognized principles, methods and procedures of the science and profession of psychology, such as interviewing or administering and interpreting tests of mental abilities, aptitudes, interests and personality characteristics for such purposes as psychological evaluation or for such purposes as overall personality appraisal or classification, personality counseling, psychotherapy or personality readjustment.
"`(b) Nothing in this definition shall be construed as permitting the use of those forms of psychotherapy which involve the administration or prescription of drugs or electro-shock or in any way infringing upon the practice of medicine as defined in the laws of this state. The psychologist who engages in psychotherapy must establish and maintain effective intercommunication with a psychologically oriented physician, usually a psychiatrist, to make provision for the diagnosis and treatment of medical problems by a physician with an unlimited license to practice the healing arts in this state. A psychologist must not attempt to diagnose, prescribe for, treat or advise a client with reference to problems or complaints falling outside the boundaries of psychological practice.' (Emphasis added [in Savoy].)[[3]]
"Thus, the trial court did not err in refusing to permit the psychologist to testify as an expert that in his opinion the physiological injury was caused by carbon monoxide poisoning."
396 So.2d at 52-53. In Knapp, supra, this Court, holding that a chiropractor was qualified to testify as to the causation of a patient's injuries, stated:
"An expert witness may testify to the ultimate issue of causation in a tort action. Macon County Comm'n v. Sanders, 555 So.2d 1054 (Ala.1990); and Harrison v. Wientjes, 466 So.2d 125 (Ala.1985). A treating physician is competent *275 to give his opinion of the cause of his patient's injuries. St. Louis & S.F.R.R. v. Savage, 163 Ala. 55, 50 So. 113 (1909).
"`In giving his professional opinion as to the extent and nature of the injury, [a physician] may state the basis upon which he has formed the opinion, his personal examination, including the symptoms given by his patient, their beginning, sequence, and continuity, the fact of a hurt or injury, and its character. These involve statements to the physician in the nature of past events and supposed causes. They must not go into the question of responsibility for the injury. They are limited to purposes of diagnosis, and come in evidence along with and as part bases for his opinion, admitted out of necessity in allowing a proper field for medical science in legal administration; the probative force of the opinion given depending on the verity of the basis on which it is formed as found by the jury.'
"Lowery v. Jones, 219 Ala. 201, 202, 121 So. 704, 706 (1929) (emphasis added [in Knapp]).
"In support of the plaintiff's claim that chiropractor Dr. Hutchins was competent to testify about the cause of the plaintiff's injuries, she cites Hoefer v. Snellgrove, [48 Ala.App. 11, 261 So.2d 426 (1971), rev'd on other grounds, 288 Ala. 407, 261 So.2d 431 (1972)]. In Hoefer, the trial court had excluded the chiropractor's testimony of his opinion about the permanency of the patient-plaintiff's back injury and about the residual effects of his back injury. The rationale of the trial court was that the chiropractor was not qualified, and that the medical doctor who treated the plaintiff was more qualified, to testify about these matters. Hoefer, 48 Ala.App. at 14, 261 So.2d at 428. Reversing the trial court, the Court of Civil Appeals held that a qualified chiropractor could testify as an expert about the extent and the permanency of his patient's injury and about the present and future treatment of his patient. Id.
"Although the issue in Hoefer is not identical to that in the case before us in that Hoefer does not specifically address whether a chiropractor can testify to the cause of his patient's injuries, Hoefer and the other cases and statutes cited in this opinion, considered together, support the proposition that a treating doctor, chiropractic or medical, is qualified to testify about the nature, the extent, the treatment, and the cause of his patient's injuries. For example, in Brown v. Lawrence, 632 So.2d 462 (Ala.1994), the chiropractor who treated the plaintiff for injuries she suffered in an automobile accident with the defendant was allowed to testify, apparently without objection on these particular points, that `the injury from the accident exacerbated his pre-existing back condition,' and that the plaintiff's `cartilage [was] scarred from the accident and... would probably trigger recurring pain.' Brown, 632 So.2d at 464. See also, e.g., Mississippi Farm Bureau Mut. Ins. Co. v. Garrett, 487 So.2d 1320 (Miss.1986); and Badke v. Barnett, 35 A.D.2d 347, 316 N.Y.S.2d 177 (1970) (holding that a treating chiropractor is qualified to give his expert opinion regarding diagnosis, causation, and prognosis of the plaintiff's injury).
"On the basis of the foregoing law, we hold that Dr. Hutchins's education, licensure, and practice as a chiropractor, and his examination and treatment of his patient in his capacity as a chiropractor, qualified him as competent to testify to the cause of the particular injuries he treated. Thus the rulings of the trial *276 court excluding Dr. Hutchins's testimony about causation on the ground `that a chiropractor who is not a medical doctor is not qualified to render an opinion as to the causation of an injury' constitute error to reverse."
786 So.2d at 462-63.
In this case, Akins argues that Davidson "was not qualified to make a medical diagnosis or opinion concerning whether Andrea Megan Miller was psychologically traumatized as a result of the wrongful cremation of Matthew Miller's body" (Akins's brief in case no. 1020198, p. 25), and that Davidson "was not qualified to testify that [Teresa Miller] suffered from post-traumatic stress disorder as a result of the wrongful cremation of Matthew Miller's body," and that Davidson "was not qualified to testify that Teresa Miller would not live as long as a result of the wrongful cremation." (Akins's brief in case no. 1020224, pp. 23-24.) Akins also argues that Davidson was not qualified to testify that "Andrea Megan Miller had the potential for a re-emergence of problems later in life." (Akins's brief in case no. 1020198, p. 25.) Akins also argues that Davidson testified that Megan Miller experienced a physical injury as a result of Matthew's cremation.
A close examination of the record, however, does not completely support Akins's characterization of Davidson's testimony or Akins's conclusions as to that testimony. Regarding Teresa Miller, Davidson testified as follows:
"Q. Now when you first met  I'm going to break this down. When you first met with Teresa, what were your clinical findings at that time?
"A. She was suffering from severe post-traumatic stress disorder."
After Akins objected on the basis that Davidson was not qualified to make a medical diagnosis and after voir dire examination of the witness, the following occurred:
"The Court: ... The question was, I believe, did you find that Teresa Miller was suffering from post-traumatic stress disorder; is that correct?
"....
"The Court: I believe she is qualified to testify to that. I'm going to allow it...."
Davidson then testified to the symptoms she had found applicable to Teresa Miller and on which she based her conclusion that Teresa Miller satisfied all the categories of post-traumatic stress disorder. She testified that the factors that exacerbated Teresa Miller's loss included not being able to see her son's body and thus to confirm his death, her financial inability to "simply write a check, you know, to have the permission that she thought she needed to see her son's remains," the fact that Matt was cremated, which was against Teresa Miller's religious beliefs. Davidson then testified that, "She's going to need long-term intensive therapy and I doubt that she will ever be able to go off her antidepressants and antianxiety medication. Stress can kill you. I anticipate that Teresa will not live as long as she could have if this had not occurred to her."
Regarding Andrea Miller, Davidson testified that Andrea has experienced flashbacks in the form of intrusive thoughts and nightmares as a result of the cremation. She also testified as follows:
"Q. I asked you about Teresa and the physical injury. Do you think that Megan experienced a physical injury because of her husband being cremated as opposed to experiencing a normal burial?
"A. The trauma literature says that is true. It's a matter of severity. With Megan, or with Teresa, they're vulnerable for the rest of *277 their lives. Any additional trauma could push them back to a lower level of functioning. I just see Megan functioning at a higher level than Teresa."
Applying the standard of review applicable in this case and considering the facts and Davidson's testimony, this Court cannot say that the trial court exceeded the limits of its discretion in allowing Davidson to testify as an expert. Her education in the field of grief counseling and in the traumatic effects induced by loss is extensive.

II.
Akins's second issue is whether the compensatory damages awarded by the jury are excessive. Akins argues that there was inadequate testimony of mental anguish to support the compensatory-damages awards. In the case of Teresa Miller, Akins argues that the compensatory-damages award of $200,000 was excessive in view of the fact that the only "medical" testimony concerning Teresa was Davidson's testimony, and that but for Davidson's testimony, the jury would have concluded that Teresa Miller's emotional distress was the result of the loss of her son, rather than the fact that he was cremated as a result of a mistake in identity. In the case of Megan Miller, Akins argues that the jury's compensatory-damages award of $450,000 was excessive because Megan Miller "has not sought any type of psychiatric treatment or counseling as a result of Matthew Miller's body being cremated"; Megan "did not have a religious preference against cremation"; no medical bills were introduced as a result of Megan's emotional distress; and Megan "is able to live on her own with her child." (Akins's brief in case no. 1020198, pp. 30-31.)
Akins cites Foster v. Life Insurance Co. of Georgia, 656 So.2d 333 (Ala.1994), and McCann v. Lee, 679 So.2d 658 (Ala.1996), in support of its contention that the compensatory damages in this case were excessive.
In McCann, this Court stated:
"`"[T]here is no yardstick by which compensatory damages for pain and mental suffering can be measured, and the ascertainment of the amount the plaintiff was due as compensation for these elements of damage must of necessity be left to the sound discretion of the jury, subject only to correction by the court for clear abuse or passionate exercise."'
"Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812, 820 (Ala.1988), quoting W.S. Fowler Rental Equipment Co. v. Skipper, 276 Ala. 593, 603, 165 So.2d 375 (1963)."
679 So.2d at 660.
In Foster v. Life Insurance Co. of Georgia, 656 So.2d 333 (Ala.1994), this Court held that a jury's award of $250,000 in compensatory damages for emotional distress and mental anguish, caused by the plaintiff's realization that she had paid for an insurance policy that turned out to be worthless, was excessive. Because she sued the company two months after she discovered that the policy was worthless, this Court held that the $250,000 compensatory-damages award was excessive because the plaintiff had endured only two months of anguish and reduced the damages by $200,000.
The Millers argue that "the defendant's arguments merely emphasize the few facts in the record that might support [Akins's] repeated refrain that it did nothing wrong." The Millers point out that Akins, "made the same claim at the trial and the jury found that defense incredible," and that "the jury found that Akins committed *278 the acts complained of and [Akins] has not formally challenged that finding on appeal." The Millers also point out that Akins "does not challenge the sufficiency of the evidence supporting any of the causes of action or claims on which the verdict's correctness could be questioned." (Teresa Miller's brief, pp. 52-53.)
Applying the legal principles that govern our review of the award of compensatory damages, this Court is unwilling to hold that the trial court erred when it declined to reduce the compensatory damages awarded to Teresa Miller and Megan Miller. It appears to us that some of the cases Akins relies on heavily to support its argument for a remittitur are distinguishable from these cases. Here, the Millers were not compensated for two months of mental distress over money wasted on worthless insurance, as was the case in Foster v. Life Insurance Co. of Georgia; they were compensated for a lifetime of distress and anguish resulting from not being allowed to view the body of a son and husband and the wrongful cremation of that body as a result of that refusal.[4]

III.
We now address Akins's argument that the punitive-damages awards of $150,000 for each plaintiff were excessive. As noted earlier, in Orkin Exterminating Co. v. Jeter, supra, this Court set out the standard of review of a punitive-damages award and stated:
"Recently, in Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the United States Supreme Court addressed the question whether an appellate court should review a trial court's punitive-damages award by applying an abuse-of-discretion standard or by applying a de novo standard. Reasoning that the guideposts established in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (`BMW'), `will acquire more meaningful content through case-by-case application at the appellate level,' the Supreme Court held that `courts of appeals should apply a de novo standard of review when passing on [trial] courts' determinations of the constitutionality of punitive damages awards.' Cooper Industries, 532 U.S. at 436, 121 S.Ct. at 1685-86. In Acceptance Insurance Co. v. Brown, 832 So.2d 1 (Ala.2001), we recently embraced that standard, holding that our review of a trial court's punitive-damages award is de novo.

"In reviewing a punitive-damages award for excessiveness, this Court considers the `guideposts' established in BMW and the factors set out in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). See Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 978 (Ala.1998)."
832 So.2d at 39.
Of the four guideposts established in BMW of North America v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Akins argues that the first guidepost, the reprehensibility of the defendant's conduct, is not satisfied in this case. In Orkin, this Court stated:

*279 "`Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' BMW [of North America v. Gore], 517 U.S. [559] at 575, 116 S.Ct. 1589 [(1996)]. Although the Supreme Court did not provide any particular yardstick by which to measure reprehensibility, it did acknowledge that trickery and deceit are more reprehensible than negligence, and that acts of affirmative misconduct, such as making deliberate false statements, are more reprehensible than making innocent misrepresentations. Id. at 575-76, 517 U.S. 559, 116 S.Ct. 1589. The Supreme Court also recognized that economic damage inflicted upon a financially vulnerable plaintiff might well support a large punitive-damages award. Id. at 576, 517 U.S. 559, 116 S.Ct. 1589."
832 So.2d at 39.
Akins argues that Megan Miller did not ask to view the body and that Teresa Miller's testimony regarding Akins's refusal to let her see the body until she had paid one-half of the costs of the funeral is "not conclusive." Akins quotes a portion of Teresa Miller's testimony that Akins argues is inconclusive as to whether Akins would not let her see the body or rather merely would not schedule a viewing at the church until one-half of the funeral expenses had been paid.
This argument however, is, as the Millers argue, merely an argument going to the sufficiency of the evidence; it is not a comment on the degree of the reprehensibility of the defendant's conduct. In addition, any question of whether Teresa Miller testified conclusively that Akins would not allow her to see the body of her son at the funeral home was cleared up when Teresa Miller testified as follows:
"Q. Was there any question in your mind, when you were talking about viewing the body that you were talking about viewing it then and there at the funeral home?
"A. No, it wasn't. I wanted to see him right then. I wanted to say goodbye to him.
"....
"Q. And what you asked him to do was let you look at the body then and there?
"A. Yes.
"Q. That's what he refused?
"A. Yes."
Akins argues that the funeral director, Raymond Vernon, testified that if asked, he would have allowed Teresa Miller to view the body, and that, "[i]n fact, Raymond Vernon believes that if a funeral home refused to allow a family member to view a body for money, it would be terrible." (Akins's brief, p. 34.) Again, this argument goes to the sufficiency of the evidence, and the jury apparently did not believe Vernon's testimony. In addition, Vernon's statement that it would be "terrible" if a funeral home did not allow a family member to view a body because of nonpayment seems to support the jury's finding that Akins's conduct in this case was reprehensible and justifies the punitive-damages awards it made in these cases.
Akins argues that one of the seven Hammond/Green Oil factors[5] weighs against an award of punitive damages in these cases: the requirement that punitive *280 damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred.
In Orkin, supra, this Court stated:
"`"Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater."' Green Oil [Co. v. Hornsby], 539 So.2d [218] at 223 [(Ala.1989)] (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially))."
832 So.2d at 41. Akins argues that the actual or likely harm to Megan Miller and Teresa Miller from its conduct was slight and that there was no medical evidence that either suffered emotional distress.
Akins also mentions, in passing, other of the Hammond/Green Oil factors, stating:
"Further, there is no harm likely to occur with Akins Funeral Home's conduct because it even acknowledges that to demand money simpl[y] to see a body[] is not appropriate. Raymond Vernon even considers such conduct reprehensible. Moreover, Akins Funeral Home did not profit from the misconduct. Akins Funeral Home never received any payment from the Miller family for the funeral of Matthew Miller. The punitive-damages award was excessive and should be remitted."
(Akins's brief, p. 36.) Again, we find this argument to be primarily a sufficiency-of-the-evidence argument and an argument denying that Akins committed any wrong. The jury obviously reached a different conclusion on this issue.
Under our de novo standard of review, we find that the trial court did not err in refusing to remit the punitive-damages awards in these consolidated cases because they were excessive.

Conclusion
Based on the foregoing, the judgment of the trial court is due to be affirmed.
This opinion was prepared by retired Justice Hugh Maddox, sitting as a Justice of this Court pursuant to § 12-18-10(e), Ala.Code 1975.
AFFIRMED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
NOTES
[1] The thrust of the Millers' cases against Akins is that Akins employees refused to permit family members to view the body at the funeral home, at a time when the fact that the body at Akins Funeral Home was not Matt's could have been discovered and the mistake rectified.
[2] The plaintiffs also sued Kilgore-Green, but Kilgore-Green entered into a pro tanto settlement with the plaintiffs and the action against it was dismissed on March 6, 2002.
[3] These code provisions now appear at § 34-26-1(b)(1) and (2). The wording in § 34-26-1(b)(1) is substantially the same, and a sentence has been added that reads: "The practice of psychologists specifically includes the use of projective assessment techniques, the diagnosis of mental disorders, and psychotherapy." The emphasized portion of paragraph (b) above has been removed from what is now § 34-26-1(b)(2) and replaced with the following: "A psychologist shall not attempt to diagnose, prescribe for, treat, or advise a client with reference to problems or complaints falling outside the boundaries of psychological practice."
[4] Footnote 8 of Teresa Miller's brief to this Court states:

"The evidence established that the cremation of Matt Miller's body was begun at 2:00 p.m. on the afternoon of January 21, 2000. The evidence also established that had the mix-up been discovered when Teresa Miller asked [Akins] to see Matt's body that morning, the cremation could have been prevented."
[5] See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).