On June 29, 1999, James R. Jordan, Sr., was a passenger onboard a Continental Airlines flight, which arrived in Birmingham. James, who was 68 years old, suffered from hypertension and walked with a cane because of a leg injury. The facts were disputed as to whether James or a member of his family had requested a wheelchair in advance of the flight. However, before leaving the airplane, James or a family member requested a wheelchair for James's use in deboarding and exiting the airplane. A flight attendant with Continental went to look for a wheelchair, but she did not return. Subsequently, a pilot offered to locate a wheelchair, but he did not return. Yvonne Jordan, James's daughter, could not locate a wheelchair at the nearby gates in the terminal. James's wife, Edna, and Yvonne assisted James into an automobile parked in a handicap-designated parking space. Edna was concerned about James's health, but James declined to go to the hospital. Upon arriving home, Yvonne checked James's blood pressure and called for emergency services. James was transported to the hospital, *Page 453 
where he died eight days later as a result of a right thalamic hemorrhage extending into his mid-brain (i.e., a stroke).
Edna sued Continental and the Birmingham Airport Authority ("BAA"), alleging negligence, loss of consortium, and breach of contract as a result of James's death. BAA moved to dismiss Jordan's negligence claim against it based on immunity provided to airport authorities pursuant to § 4-3-7, Ala. Code 1975; the trial court granted BAA's motion. Continental and BAA subsequently moved for a summary judgment; that motion was supported in part by an affidavit from Robert Slaughter, M.D. Edna responded to the summary-judgment motion two affidavits by William Ray, who has earned a Ph.D. in neuroscience. Continental and BAA moved to strike Ray's affidavits; the trial court granted the motion to strike and, at the same time, entered a summary judgment in favor of Continental and BAA. In its order, the trial court stated, in pertinent part:
 "If the Court allows the testimony of William J. Ray, Ph.D. (hereinafter `Ray'), then there is a factual issue which must go to the jury; if not, the motion for summary judgment is due to be granted.
 "The Court has considered the well-argued briefs filed by the parties in this action and the case law cited therein. The Supreme Court's decision in Knapp v. Wilkins, 786 So.2d 457 (Ala. 2000), modified slightly its holding in Kriewitz v. Savoy Heating Air Conditioning Co., 396 So.2d 49 (Ala. 1981). Kriewitz held that the trial court did not err in not allowing clinical psychologists to testify as to causation, limiting causation testimony to medical doctors. Knapp modified that holding to permit, under the circumstances of that case, a chiropractor to testify as to causation of a medical condition.
 "The circumstances in Knapp are instructive. The chiropractor in Knapp was licensed under Alabama law to diagnose certain conditions pursuant to § 34-24-120, Ala. Code 1975. Ray is not so licensed. In addition, the chiropractor in Knapp treated the plaintiff multiple times, beginning shortly after the incident in question. Such is not the case here. Ray never treated and, indeed, could not have treated Mr. Jordan. The affidavits submitted by Ray show him to be a well-qualified neurological scientist, one who is clearly qualified to testify as an expert in some areas. However, he does not have experience directly treating patients, and, therefore, is not qualified to testify as an expert as to causation in this case.
 "[The] Defendants support their motion for summary judgment with the affidavit of Robert D. Slaughter, M.D., a board certified neurologist. In his affidavit, Dr. Slaughter states:
 "`The fact that James Jordan may have walked, on his own or with some assistance, through some portion of the airport did not cause or contribute to cause the fatal cerebral hemorrhage. There is no medical basis to say with any degree of medical certainty that his walking through some portion of the airport caused or contributed to cause the onset of the hemorrhage. There is no medical basis to conclude that, but for having to walk through some portion of the airport, Mr. Jordan would not have suffered the hemorrhage, that the hemorrhage would have been less severe, or that he would not have died from the hemorrhage. To the contrary, I believe his fatal cerebral hemorrhage was caused solely by physiologic and/or genetic conditions that pre-existed the flight in question.' *Page 454 
 "The only evidence offered to counter the affidavit of Dr. Slaughter are the two affidavits of Ray. Because the Court is of the opinion that Ray is not qualified to give an opinion as to medical causation in this case, the affidavits of William J. Ray, Ph.D. are STRICKEN. Therefore, there is no evidence to dispute the affidavit of Dr. Slaughter.
 "For the reasons set forth herein, the Court finds that there is no genuine issue of material fact and the defendants are entitled to a judgment as a matter of law."
(Emphasis and capitalization in original.)
In Ponder v. Texarkana Memorial Hospital, Inc.,840 S.W.2d 476 (Tex.App.-Houston [14th Dist.] 1991), the parents of an infant who had suffered brain damage sued the hospital where the infant was born and the physicians who treated him. The jury rendered a verdict in favor of the hospital and the physicians, and the trial court entered a judgment on that verdict. However, the Texas appeals court reversed the judgment, holding that the trial court had erred in refusing to allow the parents' expert, a neuroscientist, to testify as to medical causation. The neuroscientist in Ponder taught advanced courses in neurophysiology, neuroanatomy, and neurochemistry to physicians and persons with Ph.D. degrees. He explained "that a medical doctor specializes in making diagnoses and in treating patients, while a researcher like himself specializes in finding the causes of things." 840 S.W.2d at 478. Although the court held that the neuroscientist could not testify as to whether the physicians had breached the standard of care applicable within the community for treatment of a person in the same or similar circumstances as the infant, it held that he could testify as to the cause of the infant's brain damage.
McClain v. Welker, 761 A.2d 155 (Pa.Super.Ct. 2000), involved allegations of poisoning from lead-based paint. The trial court determined that the plaintiffs' expert, who had a Ph.D. in neuroscience and psychobiology, could not testify as to medical causation. However, the appellate court held that the trial court had erred in refusing to allow the plaintiffs' expert to testify regarding medical causation solely due to his lack of formal medical training. The appellate court noted that the expert had taught medical classes, written numerous articles, and conducted research, all of which focused on brain dysfunction.
Our supreme court in Knapp v. Wilkins, 786 So.2d 457 (Ala. 2000), held that a chiropractor was allowed to testify as to the cause of the plaintiff's injuries because his education, his licensure, and his examination and treatment of his patient in his practice as a chiropractor qualified him to testify regarding the cause of the particular injuries he treated. In AkinsFuneral Home, Inc. v. Miller, 878 So.2d 267 (Ala. 2003), our supreme court held that a psychologist was qualified to offer expert testimony that the victim's mother had suffered post-traumatic stress disorder and that the victim's wife had experienced a physical injury as a result of the allegedly wrongful cremation of the victim's body. Neither the expert inKnapp nor the expert in Akins Funeral Home was a medical doctor. Although I recognize that the nonphysician experts inKnapp and Akins had treated the particular patients involved in those cases, it should be noted that Dr. Slaughter never treated James and relied on a review of James's medical records and witness testimony to arrive at his conclusions, just as did Ray, the plaintiff's expert in the present case. Ray has written numerous articles, made presentations at scientific meetings, and completed a postdoctoral fellowship at Washington University School of Medicine. He is currently *Page 455 
the senior research biochemist at a pharmaceutical company. I recognize that Ray has not treated patients; however, his experiences qualified him to testify as to causation. In one of his affidavits, Ray stated:
 "I have focused much of my time in the last 3 years to the study of risk factors for atherosclerosis and hypertension, major causes of stroke. . . . I do not have direct experience with treating patients personally as a physician, although I did work for several years in primary patient care. However, I am an expert at understanding medical literature, extracting relevant findings, and forming opinions based on the latest information. I develop the medicines and procedures that neurologists use in the treatment of patients, and for that reason, am qualified to assess a patient's state based on medical records and determine what treatments could have been used and what their likelihood of success would have been, based on the medical literature and my knowledge of emerging treatment paradigms."
With regard to the facts in this case, Ray opined, in pertinent part, as follows:
 "4. James R. Jordan, Sr.'s, medical records indicate he suffered a right thalamic hemorrhage extending into the mid-brain. The resulting blood flow caused fatal damage to his brain by increasing the pressure beyond acceptable limits. Essentially this caused Mr. Jordan's brain to herniate, or migrate, causing the fatal damage.
 "5. The deposition testimony of Edna and Yvonne Jordan as to the symptoms exhibited by James R. Jordan, Sr., indicates that Mr. Jordan's stroke began prior to his exiting the aircraft or jetway and continued thereafter. This testimony was corroborated in the emergency room notes from Mr. Jordan's medical records. In my scientific opinion the symptoms of physical weakness, a flushed appearance, slurred speech, and favoring the left side confirm a stroke in progress and should have been readily observable by anyone who saw Mr. Jordan during this period of time. Had Mr. Jordan received immediate treatment at this juncture (or earlier) either medically, with anti-edema agents, and/or surgically, the herniation and resulting damage to his brain might have been minimized sufficiently to save his life.
 "6. Further, the fact that Mr. Jordan had to physically exert himself in leaving the airport without the assistance of a wheelchair (or other similar device such as a stretcher) undoubtedly increased blood pressure and thereby increased the flow of blood at the hemorrhage site and exacerbated an already critical emergency situation."
Continental and BAA argue that Ray's testimony was speculative.
 "[A] witness, even one qualified as an expert, must have a factual basis for an opinion. Although any challenge to the adequacy of the factual basis for an expert's opinion normally goes to the weight rather than to the admissibility of the evidence, if the facts relied on by the witness clearly are insufficient to support an opinion, then the challenge may go even to the admissibility of the opinion. Morris v. Young, 585 So.2d 1374 (Ala. 1991); Alabama Power Co. v. Robinson, 447 So.2d 148
(Ala. 1983); see, also, J. Colquitt, Alabama Law of Evidence, § 7.3 (1990). A witness's testimony cannot be based on mere speculation and conjecture. Townsend v. General Motors Corp., [642 So.2d 411
(Ala. 1994)]." *Page 456 
Ammons v. Massey-Ferguson, Inc., 663 So.2d 961, 964-65 (Ala. 1995) (Houston, J., concurring specially).
Ray relied on James's medical records and on the deposition testimony of Yvonne and Edna to arrive at his conclusions. He relied on Yvonne's and Edna's descriptions of James's condition while he was in the airport. Ray reviewed the medical records from Baptist-Princeton Hospital, where James went for treatment after the flight. "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Rule 703, Ala. R. Evid. "This includes data presented to the expert by means other than personal perception, such as through the opinions, records, or reports of others." Rule 703, Advisory Committee's Notes. I do not believe that Ray's use of the phrase "might have been" precludes his testimony. Looking at the totality of Ray's testimony, he opined that it was "undoubted" that James's blood pressure increased when he was forced to exert himself by traversing the airport terminal without the aid of a wheelchair or other device and that that physical exertion increased the flow of blood at the hemorrhage site and exacerbated an already critical emergency cerebral situation, from which James was suffering when he exited the airplane. I note that Continental and BAA raised this argument in their motion for a summary judgment, and the trial court in its order stated that if Ray was allowed to testify as an expert, "then there is a factual issue which must go to the jury." Accordingly, I dissent.
CRAWLEY, J., concurs.