BRYAN, Judge.
Chad Lingefelt (“Lingefelt”), Terri K. Lingefelt, and Lance McGurk, the plaintiffs below, appeal from a summary judgment entered in favor of International Paper Company (“International Paper”), Gary Law, Lewis E. West, and Robert Osika, the defendants below, in this premises-liability action. We affirm.
Rimcor, Inc., an independent contractor, contracted with International Paper to dismantle equipment and to perform repair work in a paper mill owned by International Paper during a shutdown of that mill. Lingefelt and McGurk were Rimcor employees who were working on the shutdown of the paper mill. Lingefelt was injured in an accident that occurred near a lime kiln located in the paper mill, and McGurk was allegedly injured attempting to help Lingefelt after his accident.
A tall, circular, metal “hood” is situated at the front of the kiln. Rimcor employees planned to “pull back” the hood during the shutdown. Welded to the front of the hood and running parallel to the surface of the hood is a large, rectangular, metal duct situated at a 45-degree angle to the horizontal plane.[1] The bottom part of the duct has a circular opening into which a circular burner is inserted. The burner supplies the heat to cook the lime in the kiln; it is inserted through the circular hole in the duct and then on through a circular hole in the hood. The burner has a circular flange, or collar, and the diameter of the burner flange is almost the same diameter as that of the hole in the duct. Consequently, there is-very little room between the burner flange and the duct as the burner is being' inserted or withdrawn from the duct. The burner is moved-by a chain-pull device, also referred to as a “come-a-long.”
On March 31, 2007, the Rimcor employees ' were dismantling the equipment around the kiln. The record indicates that the Rimcor employees were not under the control or direction of International Paper in performing that work. McGurk unbolted the top part of the duct from a “transition section,” which was connected to a sfructure above the duct. Lingefelt watched McGurk disconnect the top part of the duct. Later, Lingefelt was cutting angle iron while sitting on a platform under the lower part of the duct, which was still connected to the hood. While Linge-felt worked under the duct, Rimcor employee Mike Kirby, using the chain-pull device, began to pull the burner from the kiln through the holes in the hood and the duct. As the burner was being retracted from the duct, the burner flange contacted the inside of the duct near the hole. At that point, the duct came loose from the hood, and the duct fell on Lingefelt, se *122 verely injuring him. E.J. Pomeroy, one of the Rimcor employees who witnessed the accident, testified that Kirby put “a lot of pressure” on the burner as he retracted it with the chain-pull device. McGurk testified that he was injured after the duct fell when he fell off a ladder as he was attempting to help Lingefelt.
Lingefelt, Lingefelt’s wife Terri, and McGurk sued International Paper and three of its employees: Law, the maintenance manager of the paper mill; Osika, the safety manager of the paper mill; and West, an area process manager overseeing the kiln area. The complaint, as finally amended, alleged claims of negligence and wantonness. The complaint alleged that the defendants had failed to maintain a safe premises, had failed to warn of a dangerous condition on the premises, and had failed to repair a dangerous condition on the premises. The defendants moved for a summary judgment, arguing that the evidence indicates that they did not owe any duty to the plaintiffs, that they did not breach any duty owed to the plaintiffs, and that they did not proximately cause the accident. The defendants also filed motions seeking to strike Rimcor investigation reports concerning the accident and the opinions of the plaintiffs’ proffered expert, and the trial court granted those motions. The trial court subsequently granted the defendants’ summary-judgment motion. The plaintiffs timely appealed to the supreme court, and the supreme court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala.Code 1975.
“In reviewing the disposition of a motion for summary judgment, ‘we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,’ Bussey v. John Deere Co., 581 So.2d 860, 862 (Ala.1988), and whether the movant was ‘entitled to a judgment as a matter of law.’ Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is ‘substantial’ if it is of ‘such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ Wright, 654 So.2d at 548 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).”
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
“‘In [a] premises-liability case, the elements of negligence “ ‘are the same as those in any tort litigation: duty, breach of duty, cause in fact, proximate or legal cause, and damages.’ ” ’ ” Sessions v. Nonnenmann, 842 So.2d 649, 651 (Ala.2002) (quoting Ex parte Harold L. Martin Distrib. Co., 769 So.2d 313, 314 (Ala.2000), quoting in turn other authorities). ‘Wantonness” has been defined as “the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.” Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256 (Ala.1998). “Proximate cause is an essential element of both negligence claims and wantonness claims.... Proximate cause is *123 an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred.” Martin v. Arnold, 643 So.2d 564, 567 (Ala.1994).
“Addressing the common-law duty owed a contractor, [the Supreme] Court has stated:
“1 “ ‘[The] invitor ... was under a duty to have the premises free from danger, or if they were dangerous, to give its invitee ... [the contractor] sufficient warning to enable him, through the exercise of reasonable care, to avoid the danger. This duty includes the duty to warn the invitee of danger of which the invitor knows or ought to know, and of which- the invitee does not know.’ ” ’”
Jones Food Co. v. Shipman, 981 So.2d 355, 361 (Ala.2006) (quoting Sessions, 842 So.2d at 651— 52, quoting in turn Breeden v. Hardy Corp., 562 So.2d 159, 160 (Ala.1990)) (emphasis omitted).
On appeal, the plaintiffs first argue that they presented substantial evidence supporting each element of their negligence and wantonness claims. We first address whether the record contains substantial evidence that any actions or omissions of the defendants proximately caused the accident injuring Lingefelt. Although McGurk was allegedly injured in a separate accident attempting to help Lingefelt after Lingefelt’s accident, the plaintiffs’ brief appears to treat Lingefelt’s accident as the source of McGurk’s alleged injuries. Terri Lingefelt’s claim is for loss of consortium. Therefore, all the claims in this case hinge on Lingefelt’s accident.
Shortly after the accident occurred, International Paper employees completed an incident-investigation report (“the investigation report”). The investigation report was primarily authored by West, the area process manager overseeing the kiln area. That report stated that, as the burner was being retracted through the hole in the duct, the burner flange contacted the duct. At that point, the investigation report found, the weld connecting the duct to the hood broke, and the duct shifted and-fell. The investigation report identified the “immediate and basic causes” of the accident as follows:
“1) The support connection between the bustle duct and the hood failed, allowing the duct to fall. When the duct is unbolted [from the transition piece] at the top, it becomes cantilevered[, ie., supported on only one end,] on a 45 degree angle from the ... hood, and there are no other supports or knee braces connecting or supporting this duct.
“2) The RIMCOR employee[, ie., Lingefelt,] was unknowingly working in the line of fire beneath the suspended load of the duct once the [transition piece] had been disconnected [from the duct]..
“3) As the burner was being pulled back, the flange on the burner interfered with the edge of the [hole] in the duct, in essence transferring the force of the [chain-pull device] from the burner trolley onto the duct. This added significant stress to the weld holding the bustle duct in position. [Lingefelt] was unaware that the support for the duct was under stress and the potential hazard this created.”
The investigation report also stated: “The weld between the duct and the hood was known to be damaged, but not known to be structural in nature. It had been separated for a number of years, with repairs made for the purpose of sealing the opening against air infiltration, not for repairing the support.” The plaintiffs focus on the reference in the investigation *124 report to the “damaged” weld between the duct and the hood. The plaintiffs’ theory appears to be that there is substantial evidence indicating that the damaged weld referred to in the investigation report proximately caused the duct to fall on Lin-gefelt. The defendants, however, contend that the weld referred to in the investigation report was not a structural weld supporting the duct and had nothing to do with why the duct fell.
West, the primary author of the investigation report, explained in his affidavit the nature of the “damaged” weld that he referred to his investigation report:
“Although neither I, nor anyone else with [International Paper] to my knowledge, was aware of any problem or defect- with the structural weld or welds holding the bottom part of that bustle duct to the hood, I was aware of an operational problem in the area where the bottom part of the bustle duct was attached to the hood. In the winter of 2006, ... the mill was having problems maintaining the temperature inside the ... lime kiln coke system. I found an area where I could feel that cold air was leaking into the duct or the hood at that location....
“I could see a thin strip of flat bar metal[ ] that had buckled up, creating a gap between the edge of that flat bar metal and the hood. That piece of flat bar metal had been inserted in that area, much like a piece of weather stripping around a window or door in a home, to seal that area between the bustle duct and the hood against air infiltration. Because it was metal, it had been stitch-welded into that space or gap between the bustle duct and the hood. Those stitch welds held that piece of flat bar metal in place between the bustle duct and the hood. In other words, in several locations, there were stitch welds attaching one side of that piece of flat bar metal to the edge of the bustle duct, and the other side to the hood. Those stitch welds were there to keep that thin piece of flat bar metal in place to seal that gap. Those stitch welds were not there to structurally hold the bustle duct to the hood....
“The operational problem I found with the leak at the piece of flat bar was just that, an operational problem with the coke system. It appeared to me, although I did not measure it, that there was about a 12 [inch] long gap about an inch wide between the edge of the flat bar and the hood, allowing air to leak into the duct and kiln at that area where the flat bar had buckled up. It was my impression that one of the stitch welds holding that piece of flat bar to the hood[ ] had been damaged, or had come loose, allowing that piece of flat bar to buckle up and allow that gap. We corrected that operating condition by packing some industrial insulation in that area to prevent air from leaking into the kiln. There was no concern at that time that this operational problem presented any structural issue or safety issue for that bustle duct.”
In his deposition testimony, West further clarified that the damaged weld referred to in the investigation report was the “stitch” weld holding the piece of flat bar in place between the hood and the duct. For the sake of clarity, we will refer to this weld hereinafter as the “stitch weld.”
Thomas Shelton, a metallurgical engineer, the defendants’ expert witness, testified by deposition that the flat bar with the stitch weld is not a “structural component of the system.” He further testified that the flat bar was not intended to support the duct but was there “to seal the gap [between the duct and the hood] so that *125 you don’t have air leakage.” Shelton stated that the 12-inch gap in the flat bar was “an operational issue” regarding air intrusion into the system but was not a crucial issue from a “failure analysis point of view.”
Shelton testified that the duct was actually connected to the hood by at least one “fillet weld,” a weld distinct from the stitch weld holding the flat bar in place. Shelton stated that, in addition to the fillet weld holding the duct to the hood, “the other structural component was up at the top end [of the duct] where the duct plus the ducting piping attaches to the wall. Those were the components holding it in place. If either one of those is not in place, then you’ve got a problem.” As noted, a Rim-cor employee unbolted the top part of the duct from the transition piece before the accident occurred, thereby removing, according to Shelton, one of the structural components holding the duct in place. Shelton testified that the connection between the duct and the hood before the accident had been “structurally sound.”
Shelton opined that the fillet weld broke during the accident and that the duct would not have fallen had the burner not been retracted. He further opined that the welds failed because the burner contacted the duct as the burner was being retracted, causing horizontal loading on the duct, and the welds were consequently unable “to bear the entire load with one end[, ie., the top end,] free from the support.” In his affidavit, Shelton testified that the fillet weld did not fail as a result of corrosion, oxidation, or fatigue.
Shelton testified by deposition that the flat bar with the stitch weld provided “some minor support” to the fillet weld holding the duct to the hood, although that was not what the flat bar was intended to do. Shelton testified: “The flat bar ... is [there] just totally to block the air from coming through. It may provide some minor [support] assistance, but it’s so minor that it’s not there.” Shelton testified that the 12-inch gap in the flat bar did not create a hazard to the stability of the duct when the top part of the duct was unbolted. He further stated that, if he had been told about the 12-inch gap in the flat bar before the accident, he would have advised International Paper to place insulation into the gap and to continue working, which is what International Paper employees in fact did.
 The plaintiffs’ theory of liability seems to be based on the premise that the damaged stitch weld holding the flat bar in place was structural in nature,' that the stitch weld made the connection between the duct and the hood structurally unsound, and that this condition proximately caused the accident. However, the record does not contain substantial evidence suggesting that the stitch weld proximately caused the duct to fall. The expert testimony in the record establishes that the stitch weld was not intended to be structural in nature and that any incidental support supplied by the stitch weld was so minor that “it’s not there.” The admissible evidence suggests that the duct fell because its top-side support was detached by a Rimcor employee and another Rimcor employee applied an unsupportable horizontal load to the duet by contacting the duct with the burner flange as the burner was being retracted from the duct. There was no evidence before the trial court indicating that the fillet weld providing structural support for the duct was defective. “[N]o presumption of negligence arises from the mere fact of an injury....” Jones Food Co., 981 So.2d at 361. “ ‘ “[E]vidence supporting nothing more than speculation, conjecture, or a guess does not rise to the level of substantial evidence.” ’ ” State Farm Fire & Cas. Co. v. Shady Grove *126 Baptist Church, 838 So.2d 1039, 1041 (Ala.2002) (quoting McGinnis v. Jim Walter Homes, Inc., 800 So.2d 140, 145 (Ala.2001), quoting in turn Brushwitz v. Ezell, 757 So.2d 423, 432 (Ala.2000)). Because the plaintiffs did not submit substantial evidence supporting the causation element of their negligence and wantonness -claims, the trial court did not err in entering a summary judgment on those claims in favor of the defendants.
Next, the plaintiffs argue that the trial court erred in granting the defendants’ motion to strike the opinion testimony of John Holecek, whom the plaintiffs proffered as an expert witness. In their motion to strike, the defendants argued that Holecek’s opinion testimony was inadmissible because, they said, Holecek’s opinions were outside his area of expertise and were based on an insufficient factual basis. The trial court did not specify a reason for granting the defendants’ motion to strike.
“The standard of review applicable to whether an expert should be permitted to testify is well settled. The matter is ‘largely discretionary with the trial court, and that court’s judgment will not be disturbed absent an abuse of discretion.’ Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 850 (Ala.2002). We now refer to that standard as a trial court’s ‘exceeding its discretion.’ However, the standard itself has not changed.”
Kyser v. Harrison, 908 So.2d 914, 918 (Ala.2005). “A trial court has great discretion in determining the admissibility of evidence....” Grayson v. Dungan, 628 So.2d 445, 447 (Ala.1993). Rule 702, Ala. R. Evid., provides:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
The plaintiffs argue that Holecek is qualified to testify as an expert. The plaintiffs note several factors that they say qualify Holecek as an expert, including the following: Holecek has a bachelor’s degree and a master’s degree in mechanical engineering; he is a licensed professional engineer; he took classes in mechanical design and metallurgy; his previous work for an engineering company included the design, manufacture, and installation of duct work for industrial furnaces and ovens and he dealt extensively with welding in that work; and his experience with the engineering company concerned field welding that he concluded was similar to the welding in this case.
In his deposition testimony, Holecek testified that he had been retained to provide his opinion regarding the cause of the accident. Accordingly, Holecek would necessarily testify as to what caused the relevant weld or welds to fail. However, Holecek testified that he had never been involved in any cases involving welds breaking loose from a stationary piece of equipment. Holecek was asked by counsel for the defendants whether, in his entire career, he had ever been involved in any matters concerning the “inspection of structural welds that join two pieces of equipment together ... at a manufacturing plant like [International Paper’s] plant.” Holecek answered that “the present case is the first case I’ve dealt with that involved a weld in any capacity.” Ho-lecek also stated that he had never provided expert testimony in a case involving the ducts associated with a lime kiln.
Our supreme court has stated that “ ‘an expert may not testify to his opinion on *127 matters outside of his field of training and experience.’ ” Kyser, 908 So.2d at 919-20 (affirming a trial court’s exclusion of proffered expert testimony by a physician when the physician had training in forensic pathology but not pediatric forensic pathology) (quoting Central Aviation Co. v. Perkinson, 269 Ala. 197, 208, 112 So.2d 326, 831 (1959)). See also Furin v. City of Huntsville, 3 So.3d 256, 261-62 (Ala.Civ.App.2008) (affirming a trial court’s disqualification of an engineer’s testimony when the engineer had training and experience in civil engineering and aerospace engineering but not in matters pertaining to floods or their causes). In this case, there is evidence from which the trial court could have concluded that Holecek was not qualified as an expert to testify regarding the issue of the failure of the weld or welds between the duct and the hood. Accordingly, the trial court did not exceed its considerable discretion in disallowing Ho-lecek’s testimony.
Moreover, Holecek’s opinion testimony regarding what caused the weld or welds to fail is based on speculation and conjecture. “A[n expert] witness’s testimony cannot be based on mere speculation and conjecture.” Townsend v. General Motors Corp., 642 So.2d 411, 423 (Ala.1994). As we have noted, “no presumption of negligence arises from the mere fact of an injury....” Jones Food Co., 981 So.2d at 361.
“[A] witness, even one qualified as an expert, must have a factual basis for an opinion. Although any challenge to the adequacy of the factual basis for an expert’s opinion normally goes to the weight rather than to the admissibility of the evidence, if the facts relied on by the witness clearly are insufficient to support an opinion, then the challenge may go even to the admissibility of the opinion. Morris v. Young, 585 So.2d 1374 (Ala.1991); Alabama Power Co. v. Robinson, 447 So.2d 148 (Ala.1983); see, also, J. Colquitt, Alabama Law of Evidence, § 7.3 (1990).”
Ammons v. Massey-Ferguson, Inc., 663 So.2d 961, 964-65 (Ala.1995) (Houston, J., concurring specially).
In his deposition, Holecek testified:
“Q. [By counsel for the defendants:] Have you done anything in this case to enable you to offer an opinion as to whether or not a structural weld in this case failed because of stress as opposed to fatigue and corrosion?
“A. No, I’ve not tried to determine the manner of failure of this particular weld.”
Holecek then testified that “the weld” between the duct and the hood was “insufficient.” When asked by counsel for the defendants how the weld was insufficient, Holecek stated:
“Simply from the fact that had it been welded up, for example, in accordance with the original drawings that showed the manner in which it should have been welded, it is my opinion it would not have fallen. So therefore the fact that it did fall would indicate it was insufficiently welded.”
Holecek stated that the “original drawings” for the attachment of the duct to the hood called for the duct to be attached to the hood with a “three-eighths filet weld” but that he did not know how those two pieces of equipment were actually attached during installation. Holecek testified that he did not know the condition of the structural weld holding the duct to the hood before the accident but, he stated, “the mere fact that it failed is ... an adequate basis for [a determination of] the insufficiency of that connection....” Holecek also testified:
*128 “Q. [By counsel for the defendants:] Do you have any scientific evidence where you can establish that that duct would have fallen at the time of this accident even without the force put on it by the come-a[-]long or the chain pull [device]?
“A. No, I don’t know that.”
Based on the foregoing, the trial court was justified in determining that, even if Holecek was qualified as an expert, his testimony regarding the essential issue of the cause of the accident was based on conjecture and speculation. Accordingly, for this additional reason, the trial court did not exceed its discretion in striking Holecek’s opinion testimony.
Next, the plaintiffs argue that the trial court erred in granting the defendants’ motion to strike Rimcor accident reports concerning Lingefelt’s accident. The reports were completed by Robert Caraway, a Rimcor safety manager. Caraway did not witness the accident; he completed the reports after viewing the accident site and interviewing Lingefelt, witnesses to the accident, and International Paper personnel. In pertinent part, the reports stated:
“Conditions and/or actions that may have led to accident:
“Close inspection by [International Paper] personnel determined that the weld holding the duct to the kiln hood was deteriorated due to age and corrosion. Work had been done on the duct in the past year and further repairs were planned
“It was determined no activity by [Lingefelt] or Rimcor was the cause of the failure.”
(Bold typeface omitted.)
The defendants’ motion to strike the reports argued, in part, that the reports contained
“hearsay, hearsay within hearsay, speculation and conjecture, and conclusions and opinions as to how the accident occurred, information not based on personal knowledge, and specific corrective actions, all of which are inadmissible pursuant to one or more of Rules 407, 602, 701, 702, and 802, Ala. R. Evid. Any probative value is outweighed by unfair prejudice to the Defendants. Rule 403, Ala. R. Evid. Any admissible information contained in these reports can be provided and explained by live witnesses and/or deposition testimony.”
The trial court granted the motion to strike the reports without specifying a reason.
The plaintiffs seem to implicitly recognize that, unless an exemption or exception applies, the pertinent parts of the reports are hearsay. The plaintiffs first argue that the reports are admissible as a party admission:
“What the Defendants failed to acknowledge in their argument [in their motion to strike] is that the ‘hearsay’ information that was included in Rimcor’s accident reports came directly from [International Paper’s] mill safety manager, Robert Osika[, who is one of the defendants]. Thus, the information that Mr. Caraway obtained from Robert Osika and included within Rimcor’s accident reports would qualify as a party admission under Ala. R. Evid.[, Rule] 801(d)(2).”
Plaintiffs’ brief at 49. Rule 801(d)(2), Ala. R. Evid., provides, in pertinent part, that “[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... the party’s own statement in either an individual or a representative capacity or ... a statement of which the party has manifested an adoption or belief in its truth....”
*129 The record does not indicate that the plaintiffs argued to the trial court that the Rimeor reports are admissible under Rule 801(d)(2). This court does not consider arguments advanced for the purpose of reversing a trial court’s judgment when those arguments were never presented to the trial court. State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 821 (Ala.2005). Moreover, the reports do not qualify as nonhearsay as an admission by Osika. The reports themselves do not attribute any of the pertinent information to Osika. In his deposition testimony, Caraway, the author of the reports, testified that the pertinent information in the reports were Caraway’s own conclusions that he had drawn from his own observations and from his conversations with others, including Osika. Therefore, we cannot say that the pertinent parts of the reports should be considered Osika’s admissions under Rule 801(d)(2).
The plaintiffs also argue that the reports are admissible as a business-record exception to the hearsay rule, pursuant to Rule 808(6), Ala. R. Evid. Rule 803 provides, in pertinent part:
“The following are not excluded by the hearsay rule, even though the de-clarant is available as a witness:
[[Image here]]
“(6) ... A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term ‘business’ as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.”
The Advisory Committee’s Notes to Rule 803(6) provide, in pertinent part:
“It should be emphasized that satisfying the present hearsay exception does not give the evidence carte blanche admissibility over other independent objections, such as those relating to opinion, irrelevancy, best evidence, etc.... These other evidentiary rules of exclusion would have to be satisfied also.... Rule 803(6), by use of the words ‘opinions’ and ‘diagnoses,’ merely stands for the proposition that these things are admissible through records if they are otherwise qualified under the opinion rule, as would be the case if the statement had been made by an expert as recognized by Ala. R. Evid. 702, or is ‘helpful,’ as now provided by Ala. R. Evid. 701.”
Similarly, our supreme court, in discussing the applicable statute that preceded Rüle 803(6), Tit. 7, § 415, Ala.Code 1940, has stated:
“ ‘Opinions circumventing the opinion .rule are no more admissible in a memorandum in evidence than they would be in oral testimony.’ A party to a suit cannot make an office memorandum containing conclusions, opinions, hearsay and irrelevant statements, which are illegal evidence, and cause it thereby to be admissible against an opponent when it may have a prejudicial effect on him.”
Stremming Veneer Co. v. Jacksonville Blow Pipe Co., 263 Ala. 491, 495, 83 So.2d 224, 227 (1955) (citations omitted). See also Greathouse v. Credit Bureau, Inc., *130 279 Ala. 524, 526, 187 So.2d 565, 566 (1966) (quoting Stremming Veneer).
In this casé, Caraway, the author of the reports, testified that the pertinent information in the reports were his own conclusions that he had drawn from both his own observations and from his conversations with others. Therefore, the pertinent parts of the reports essentially constituted Caraway’s opinion testimony. The pertinent parts of the reports addressed the allegedly deteriorated physical condition of the weld holding the duct to the hood while concluding that Rimcor employees did nothing to cause the accident. As Shelton’s deposition testimony suggests, testimony regarding the functioning of the equipment and the possible causes of the accident requires the type of “specialized knowledge” contemplated by Rule 702, Ala. R. Evid., which permits testimony by qualified experts. However, the plaintiffs do not cite any evidence that Caraway is qualified as an expert witness. The trial court did not exceed its discretion in granting the motion to strike the reports.
Further, assuming that Caraway’s conclusions did not concern matters reserved for an expert, Caraway’s conclusions that the Rimcor employees did not cause the accident are not admissible under Rule 701, Ala. R. Evid., which concerns opinion testimony of lay witnesses. The Advisory Committee’s Notes for Rule 701 state that opinions should be excluded if they “ ‘amount to little more than choosing up sides.’ Fed.R.Evid. 701 advisory committee’s note. Assertions that one is ‘liable,’ ‘guilty,’ or ‘at fault’ generally would not be helpful and thus would properly be excluded.”
Based on the foregoing, the summary judgment of the trial court is affirmed.
AFFIRMED.
PITTMAN, THOMAS, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. The duct is sometimes referred to as the “bustle duct" in the briefs and in the record on appeal.